**UNITED STATES of America, Plaintiff-Appellee,**

v.

**Julius WEST, Defendant-Appellant.**

**No. 72–1946.**

United States Court of Appeals, Sixth Circuit.

Argued Feb. 16, 1973.

Decided Oct. 31, 1973.

J. Warren Eardley, court appointed, Grand Rapids, Mich., on brief, for defendant-appellant.

John Milanowski, U. S. Atty., Robert C. Greene, Asst. U. S. Atty., Grand Rapids, Mich., on brief, for plaintiff-appellee.

Before PHILLIPS, Chief Judge, McCREE, Circuit Judge, and WILSON*, District Judge.

McCREE, Circuit Judge.

In this appeal from conviction of bank robbery,[1] use of a firearm to commit a felony against the United States,[2] and killing of a bank employee in the course of the robbery,[3] we are asked to determine whether the prosecution's opening statement and its calling of a reluctant witness constitutes reversible error and whether two searches, one with and one without a warrant, were lawful. We affirm the judgment.

On January 10, 1972, at approximately 1:30 p. m., a branch of the First National Bank of East Lansing, Michigan, an institution insured by the Federal Deposit Insurance Corporation, was robbed of approximately $15,000 by a male posing as a female. The branch manager, a retired 62 year old former school teacher, struggled with the bandit in an attempt to prevent the robbery and was fatally shot.

Appellant was arrested on January 12 and the grand jury returned a three-count indictment. Appellant moved to suppress evidence taken from his apartment pursuant to an alleged consent search on January 11 and another conducted the following day under the authority of a search warrant. The motion was denied and a jury trial ensued in which West was convicted on all counts. He received a twenty year sentence for the bank robbery, a ten year sentence for possession of a weapon in the perpetration of the robbery, and a life sentence for homicide. The sentences are to run concurrently. The proceeds of the robbery had not been recovered at the time of trial.

The government's evidence, not affected by appellant's charge of incompetency, follows.

In July or August 1971, appellant, in a conversation with his brother-in-law, said that the bank on Lake Lansing Road would be easy to rob because it was located in a secluded place. They discussed the feasibility of a robber disguising himself as a woman.

Julius West customarily wore a moustache and goatee, but on January 9, 1972, he was observed to be clean-shaven. On January 10, 1972, shortly before 2 p. m., an automobile, later found to be registered in the name of appellant's wife, was driven into a service station on Lake Lansing Road in the vicinity of the bank. The automobile was unmistakably distinctive: a 1963 or 1964 green or dark blue Ford automobile with the headlights smashed in and the hood tied down by a piece of colored plastic string that was described as looking like a child's jump rope. The driver was identified as a lady and she and the other occupant wore "large Afros". They asked to have their water checked because the radiator was steaming. The attendant testified that the vehicle departed in the direction of the bank.

Other witnesses observed the same vehicle with two passengers on Lake Lansing Road at about this time. They described the occupants as colored, with "Afro hairdos", and their attention was attracted by the damaged front end and the tied down hood. One of these witnesses saw the car parked in the bank parking lot shortly before 2 p. m. that day. He noticed that steam was escaping from its radiator and that a woman was attempting to tie the hood down with a multi-colored string. She spurned his offer of assistance. He observed that there was a passenger whom he thought to be a woman. Two of these witnesses later identified the same vehicle in the parking lot at appellant's apartment.

The bank teller, the only other person besides the branch manager who was in

---

* The Honorable Frank W. Wilson, Chief Judge, U. S. District Court for the Eastern District of Tennessee, sitting by designation.

1. 18 U.S.C. § 2113(a).

2. 18 U.S.C. § 924(c)(1).

3. 18 U.S.C. 2113(e).

the bank before the bandit entered, testified that a man disguised as a woman and wearing a black and green tweed coat, a large "Afro" wig, earrings and black slacks, approximately five feet eight inches tall, clean-shaven with clear complexion and large lips, entered the bank at approximately 1:30 p. m. She described his actions and narrated the efforts of the manager to overpower the robber and how the manager was shot several times with a silver or aluminum colored handgun. Although she could not identify appellant at a showup or at the trial, she identified a coat that belonged to appellant's wife as similar to the one worn by the robber.

Appellant's brother's common-law wife, Pauline Rogers, lived in the same building in which appellant's apartment was situated. She testified that on the evening of January 10, she saw appellant holding a large number of $50 bills and other denominations and that he dropped some of the money. She recovered about $62 of the money he dropped and hid it on her person. She said that appellant boasted to his brother that he and his wife had robbed a bank in East Lansing that day and that he had shot a man five times. He said that he was dressed as a woman with a natural wig, earrings, coat, big pocketbook and a slack suit. She identified a chrome or nickel-plated Smith & Wesson revolver as her husband's gun and said that appellant had access to it. She said that on the evening of the robbery her husband gave her the gun and that she hid it first in her niece's backyard and later gave it to her brother to hide for her. Her brother, Andrew Perkins, buried the gun near Charlotte, Michigan, a neighboring community. Perkins later took law enforcement officers to the place where he had buried the gun and it was recovered. Ballistics tests established that the bullet removed from the body of the slain branch manager had been fired from the revolver recovered at Charlotte, Michigan.

Pauline Rogers also testified that appellant's wife, her sister-in-law, gave her a coat earlier identified by the bank teller as one similar to that worn by the robber. Pauline Rogers first gave the coat to a girlfriend who returned it when she learned about its recent use. Then, she gave a man $10 to burn the coat or otherwise dispose of it but his attempt to burn it failed and he returned it. She later surrendered the coat to an FBI agent.

A fellow inmate testified that West, while he was in custody awaiting trial, told him, "they could not prove it was me because nobody could identify me."

Undisputed laboratory tests revealed that a hair fiber found on the woman's coat was similar to hair obtained from Julius West, and that two hairs found on the coat were similar to hair obtained from the head of the deceased branch manager. Also, fibers from the coat matched fibers found in the branch manager's tie clasp, and fibers from the victim's clothing matched fibers from the coat recovered from Pauline Rogers.

Appellant took the stand in his own behalf and testified that he had been suffering from an arthritic spinal condition on January 10 and that he had remained home alone and in bed all that day. He denied any involvement in the bank robbery and said that his wife's black and green tweed coat had been stored in the basement of his apartment building and that he believed she had not been wearing it. He admitted that he wore a moustache and goatee before January 10, 1972, but explained that he shaved them off because he had accidently cut off one side of his moustache and that he removed the other half and his goatee when he became the object of ridicule with only a goatee. He admitted that the automobile that had been observed at the bank was registered in his wife's name but stated that it belonged to his son-in-law who was too young to register it in his own name.

■ Appellant's first contention of error is that he was denied a fair trial when the United States attorney outlined in detail in his opening statement

the expected testimony of Timothy Williams, appellant's stepson, who thereafter did not testify as predicted. He contends that the United States attorney's conduct in calling Timothy Williams to the stand, even after he had been granted immunity, constituted the denial of a fair trial.

In his opening statement, the United States attorney outlined the evidence he expected from all the witnesses and included a summary of the evidence he expected from Timothy Williams. He told the jury that he expected that Timothy would testify that he did not attend his high school classes on January 10 and that he was home after two o'clock when his stepfather and mother returned; that his stepfather was dressed as a woman; that his stepfather inquired from his mother whether they had obtained any "ones"; and that his stepfather asked him to unfasten a brassiere which he was wearing.

Timothy Williams had given a statement substantially to this effect to investigating FBI agents, and, at the trial, the United States attorney called Timothy Williams as a witness. Defense counsel requested that the jury be excused and then suggested to the court that Williams might incriminate himself if he should testify consistently with the statement which defense counsel had been permitted to examine. The court examined the witness out of the presence of the jury and decided to appoint an attorney to represent him because of the possibility of self-incrimination and because he was only 16 years old. Accordingly, he was temporarily excused from testifying.

While the trial proceeded with other witnesses, the government obtained an immunity order for Timothy Williams pursuant to 18 U.S.C. § 2514. Thereupon, the court and the lawyer appointed to represent him explained to him that he could no longer assert the privilege

against self-incrimination. Williams then was recalled to the stand and, after testifying that he lived with his stepfather and mother, said that he preferred not to answer the questions whether his parents left the apartment on January 10. Although the court instructed him to answer, he refused. He testified that he had seen his mother wear the coat that had been received in evidence, denied that he had seen the gun, and said he preferred not to answer the question whether his stepfather had a moustache and goatee prior to January 10. He also declined to answer this question when the court instructed him to do so. He admitted that he took part of a wig in his tennis shoes to his locker at school but denied he knew who put the parts of the wig in his shoes. He did not recall whether his stepfather came home wearing a green coat and a brassiere, or whether he was asked to help unfasten the brassiere. The court took no action against Timothy Williams for declining to answer as instructed.[4] Defense counsel timely moved for a mistrial.

At the outset, we observe that this is not a case where an inflammatory opening statement was made to poison the minds of the jury against a defendant or to destroy his credibility before any evidence should be presented. *Cf.* United States v. Signer, 482 F.2d 394 (6th Cir., 1973). Nor is it a case where the prosecution made an opening statement in bad faith without any reasonable expectation of presenting the promised evidence. *See* San Fratello v. United States, 340 F.2d 560 (5th Cir. 1965). And it is not a case where a prosecutor, in his questioning of a witness who claimed his privilege against self-incrimination, employed improper examination techniques such as reading the entire transcript of an FBI interview to see whether the witness would contradict it, United States v. Compton, 365 F.2d 1 (6th Cir. 1966); or persistently asking

---

4. 18 U.S.C. § 2514 provides that upon entry of an immunity order a witness shall not be excused from testifying on the ground that the evidence required of him may tend to incriminate him. It also provides that the witness shall not be exempt from prosecution for perjury or contempt committed while giving testimony under compulsion.

the same questions that had been repeatedly answered in the negative, Jones v. United States, 119 U.S.App.D.C. 213, 338 F.2d 553 (1964); or prefacing questions with the inquiry "did you tell me" in such a manner as to place in issue the prosecutor's credibility, United States v. Puco, 436 F.2d 761 (2nd Cir. 1971). Here appellant does not accuse the prosecution of any misconduct and we find none.

Appellant contends, nonetheless, that error was committed because the opening statement placed before the jury the testimony of Timothy Williams, testimony that appellant could not test by cross-examination because the witness refused to be examined on the critical matters related. Accordingly, he claims his constitutional right to be confronted by the witnesses against him was abridged. *See* Douglas v. Alabama, 380 U.S. 415, 85 S.Ct. 1074, 13 L.Ed.2d 934 (1965).

However, we determine that the facts in this case bring it within the rule of Frazier v. Cupp, 394 U.S. 731, 89 S.Ct. 1420, 22 L.Ed.2d 684 (1968), instead of that enunciated in *Douglas, supra,* where under guise of cross-examination, and despite the refusal of a witness to answer, the prosecution read, in the presence of the jury, the witness's confession that implicated the defendant and then proceeded to authenticate the confession, although it was never introduced in evidence, by the testimony of three law enforcement officers. In Frazier v. Cupp, it was held that no deprivation of the right of confrontation results when a prosecutor sets forth in his opening statement a summary of the testimony he expects, in good faith, from a witness who later declines to testify, when the summary is not emphasized in any particular way, takes only a few minutes to recite, and is sandwiched between a summary of other evidence the prosecution expects to introduce. In this appeal, Williams' testimony was not isolated in the opening statement but, instead, was an integrated part of a statement that fairly summarized all the evidence, circumstantial and direct, that the prosecution intended to present to prove the crimes charged in the indictment. And, as in Frazier v. Cupp, the district court advised the jury that the opening statement, as the United States attorney also declared, is not evidence and should not be so regarded.

Another factor not to be overlooked in this case is that Williams was called as a government witness and did in fact testify, although his direct testimony was limited by his professions of lack of memory and by his declining to answer significant questions. Also not to be overlooked is the fact that Williams was offered for cross-examination, a right the defense declined to exercise.

We observe, however, that this case alerts us to the potential danger presented by a too-detailed opening statement. If a failure of proof should occur, the jury in its deliberations might consider, as if it had been given, the testimony it was told to expect from a witness even though that witness did not testify. And if a court apprehends a substantial danger of a jury's doing so, the prosecution risks a mistrial or reversal of a conviction. Here, we are satisfied that the prosecutor did not overstep the line drawn by *Frazier,* and did everything he could after the opening statement to prevent prejudice in this respect. He obtained an order of immunity to require the witness to testify and he could have insisted on the witness answering his questions. That he and the court did not follow this course may have been because Williams' lawyer and the prosecutor disclosed that the boy had been threatened by appellant in an effort to seal his lips. A careful review of the entire record convinces us that no error was committed with respect to the opening statement and the testimony of Timothy Williams.

Appellant's remaining two contentions of error concern the two searches of his apartment. The first search was conducted on January 11, 1972 and yielded a spool of beige thread similar to some thread found in the bank and a button

that matched those on the coat received later from Pauline Rogers. The government contends that this search was lawful because appellant consented to it and evidenced his acquiescence by executing a consent-to-search form.

The second search was carried out on January 13 pursuant to a search warrant. On this occasion, the FBI agents seized a rhinestone Christmas tree-shaped ornament that matched parts of earrings found in the bank, and black fibers that matched fibers found on the black and green coat and could have come from the wig.

Appellant contends that the district court erred in finding that his consent to the first search was voluntary. He claims the evidence showed that he was intimidated by the eight officers who pointed a shot gun at him and falsely told him they could obtain a warrant, although their request for one had just been denied by a magistrate. He contends that the second search was unlawful because the affidavit upon which the search warrant was based contained information obtained in the first search and contained hearsay evidence not from proven reliable sources.

We regard as substantial the question whether consent can be voluntary when it is procured from a suspect confronted with a firearm and deceived by the false assertion that a search warrant can be obtained. "[T]he Fourth and Fourteenth Amendments require that a consent not be coerced, by explicit or implicit means, by implied threat or covert force. For, no matter how subtly the coercion were applied, the resulting consent not be coerced, by explicit or imfor the unjustified police intrusion against which the Fourth Amendment is directed." Schneckloth v. Bustamonte, 412 U.S. 218, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973).

■ Nevertheless, we find it unnecessary to decide whether these searches were valid because we determine that the evidence obtained from them, considered in the light of the other overwhelm-

ing proof of guilt, did not affect the verdict. Accordingly, any error resulting from the admission of this evidence is harmless beyond a reasonable doubt. Brown v. United States, 411 U.S. 223, 93 S.Ct. 1565, 36 L.Ed.2d 208 (1973), Chapman v. California, 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967).

Affirmed.