UNITED STATES of America,
Plaintiff-Appellee,

v.

Charles Albert MULLIGAN et al.,
Defendants-Appellants.

Nos. 73-1715, 73-1716, 73-1717.

United States Court of Appeals,
Ninth Circuit.

Nov. 9, 1973.

733

Jack M. Schulman (argued), Cleveland, Ohio, for defendants-appellants.

William D. Keller, U. S. Atty., Robert C. Bonner, Asst. U. S. Atty. (argued), for plaintiff-appellee.

Before CHAMBERS and DUNIWAY, Circuit Judges, and SCHWARTZ,* District Judge.

OPINION

DUNIWAY, Circuit Judge:

Mulligan, Christopher and Dinsio appeal from convictions on three counts of an indictment. Count I charged conspiracy to burglarize the United California Bank (hereinafter referred to as the "Bank") in Laguna Niguel, California, in violation of 18 U.S.C. § 371; Count II charged entering the Bank on or about March 24–27, 1972, with intent to commit larceny, in violation of 18 U.S.C.

* The Honorable Edward J. Schwartz, Chief Judge, United States District Court, Southern District of California, sitting by designation.

§ 2113(a); Count III charged theft of money and property of a value exceeding $100, in violation of 18 U.S.C. § 2113(b).

## I. Searches and Seizures

Appellants challenge the legality of three searches and seizures.

a. *The Search in Christopher's Residence.*

■ Viewing the evidence in the light most favorable to the government, the following are the facts. At about 7:30 in the morning, Christopher was arrested by FBI agents at his Cleveland, Ohio, residence pursuant to a parole violation warrant. When arrested in the upstairs hallway, Christopher was wearing only pajama shorts. Once under arrest, Christopher entered his bedroom, followed by the FBI agents, so that he could obtain clothing, and was ordered to sit on his bed. He was not handcuffed.[1] Between two and one-half feet and three and one-half feet from where Christopher was seated was a closet, the door to which was open.

Immediately after Christopher was ordered to sit on the bed, he stood up without permission and picked up a pair of undershorts lying next to the closet. This action surprised the agents, and Christopher was ordered to sit back on the bed. Within 45 to 60 seconds, Christopher again stood up and moved toward the closet. Agent Robertson, standing between the bed and the closet, put his hand out to stop Christopher; another agent ordered him to return to the bed and asked him what he wanted. Christopher replied that he wanted a pair of pants, whereupon agent Robertson took a pair of pants hanging on the closet door and passed them to another agent, who emptied the pockets and handed them to Christopher.

Agent Robertson then drew his gun and "brushed the clothing that was hanging in the closet aside to see if there was anybody hiding in there." He felt "a large lump in the bottom of a garment bag, a hard lump that could have been a weapon." He then reached into the garment bag and pulled out a package of money, which contained approximately $30,000 in cash.

Appellants argue that the search violated Chimel v. California, 1969, 395 U. S. 752, 89 S.Ct. 2034, 23 L.Ed.2d 685, and its progeny. *Chimel* delineated the types of searches permissible incident to a valid arrest:

> There is ample justification, therefore, for a search of the arrestee's person and the area "within his immediate control"—construing that phrase to mean the area from within which he might gain possession of a weapon or destructible evidence. 395 U.S. at 763, 89 S.Ct. at 2040.

The real issue, then, is whether the closet was within Christopher's "immediate control;" was it an "area from within which he might gain possession of a weapon . . ."? It was not unreasonable for agent Robertson to search the open closet to see if someone was hiding there with a weapon to help Christopher resist arrest or effect his escape. The search was additionally justified by Christopher's two sudden movements toward the open closet. Although he was ostensibly trying to reach his clothes, these two actions surprised the agents and aroused agent Robertson's suspicions that someone might be hiding in the closet with a weapon. Under these circumstances, the closet was within Christopher's immediate control; it was an "area from within which he *might* gain possession of a weapon. . . ." *Id.* (emphasis added) *See also* United States v. Wysocki, 5 Cir., 1972, 457 F.2d 1155, 1160; United States v. Patterson, 10 Cir., 1971, 447 F.2d 424; Application of Kiser, 8 Cir., 1969, 419 F.2d 1134, 1137.

Appellants argue that this case does not fall within the ambit of *Chimel*, citing United States v. Mapp, 2 Cir., 1973, 476 F.2d 67 and United States v. Shye, 6

---

1. *Cf.* United States v. Baca, 10 Cir., 1969, 417 F.2d 103, 105.

Cir., 1973, 473 F.2d 1061. In *Mapp*, the defendant, a known seller of heroin, was seen to enter the apartment of one Linda Walters carrying a large brown paper bag. After he left the apartment ten minutes later without the bag, federal narcotics agents forced their way into the apartment, arrested Ms. Walters in her bedroom, and demanded the package that Mapp had left earlier. She pointed to a closed closet in the bedroom. A search of the closet produced a brown paper bag containing two kilograms of heroin. The court held that this evidence must be suppressed. The difference between that case and the one before us is apparent.

■ In United States v. Shye, *supra,* the Sixth Circuit affirmed the District Court's suppression of a bag of money found in a "closet-type depression" next to a water heater in an apartment in which the four defendants were arrested. 473 F.2d at 1063. Although the bag of money was only four feet from one of the defendants, the court held that the area from which the bag was seized was not within the defendant's "immediate control," as defined in *Chimel*. *Shye* is easily distinguishable from the present case. In *Shye*, as in *Mapp, supra,* the only purpose of the search was to seize evidence. The search here was to protect the agents from possible harm. The latter type of search is expressly condoned by *Chimel;* the former is expressly forbidden without a search warrant.

b. *The Search of Dinsio's Residence.*

On June 27, 1972, a search warrant was issued for appellant Dinsio's residence in Boardman, Ohio. The supporting affidavit contained the following salient allegations:

1. Dinsio was connected with the burglary of the Bank. A June 2, 1972, search of an automobile, discussed *infra,* produced, among other items, a shotgun, walkie-talkies, drills, flashlights and batteries, gloves, hammers, and three gold coins identified as having been stolen during the burglary from a safety deposit box in the Bank. One of the hammers was identified as the tool used to force safety deposit boxes during the burglary. In addition, Dinsio's fingerprints were found on the flashlight batteries.

2. $98,600 was discovered buried in the ground across the street from Dinsio's residence.

3. According to a reliable informant, Dinsio's habit upon completing a burglary was to bury some of the loot.

4. A reliable informant was told by Dinsio that he had robbed an Ohio bank and had a large portion of stolen money in his possession.

5. The Boardman, Ohio, address was Dinsio's sole residence.

6. When Dinsio was arrested he had $537 on his person.

■ Appellants assert that the affidavit did not state probable cause for the search. The constitutional requirements for a valid search warrant were set forth in Aguilar v. Texas, 1964, 378 U.S. 108, 84 S.Ct. 1509, 12 L.Ed.2d 723, and further explicated in Spinelli v. United States, 1969, 393 U.S. 410, 89 S. Ct. 584, 21 L.Ed.2d 637. *Aguilar* requires an affidavit that discloses the underlying circumstances from which the affiant has concluded that his information is reliable and that contains a statement of the underlying circumstances "to enable the magistrate independently to judge of the validity" of the affiant's conclusion that the things to be seized are where he says they are. United States v. Bailey, 9 Cir., 1972, 458 F.2d 408.

■ On appeal, the test applied by this court is that "[t]he facts submitted to the Commissioner must be sufficient to justify a conclusion by him that the property which is the object of the search is probably on the person or premises to be searched at the time the warrant is issued." Durham v. United States, 9 Cir., 1968, 403 F.2d 190, 193. Moreover, if "in a particular case it may not be easy to determine when an affidavit demonstrates the existence of probable cause, the resolution of doubtful or marginal cases in this area should

be largely determined by the preference to be accorded to warrants." United States v. Ventresca, 1965, 380 U.S. 102, 109, 85 S.Ct. 741, 746, 13 L.Ed.2d 684.

 Here the magistrate had before him six important allegations concerning Dinsio. In reviewing the affidavit, we ignore the fourth allegation listed above. The fact that Dinsio told an informant that he had robbed an Ohio bank is irrelevant to a search warrant which on its face is specifically limited to evidence related to the robbery of a California bank. Nevertheless, the remaining five allegations did present sufficient probable cause. They linked Dinsio with the crime, and the allegation concerning the buried money linked him with evidence of the crime. The latter allegation meets the double test of *Aguilar*. Although there was no direct evidence that any evidence from the burglary was inside Dinsio's residence, there was sufficient evidence from which the magistrate could use his common sense to infer that the loot and tools, if not buried, were probably in the house. United States v. Ventresca, *supra*, 380 U.S. at 108, 85 S.Ct. 741. The fact that Dinsio was arrested with only $537 on his person and that the Boardman house was his sole residence increased this probability.[2]

 Because "only the probability, and not a prima facie showing, of criminal activity is the standard of probable cause," [3] we conclude that the affidavit contained a sufficient constitutional basis for a finding of probable cause.

### c. The Search of a 1962 Oldsmobile.

On June 2, 1972, a search warrant was issued for a 1962 Oldsmobile automobile parked in the driveway of one Earl Dawson in Tustin, California. Appellant Mulligan had brought the car to Dawson's residence in late March, 1972, and it remained there until the June 2 search. The car was registered under a fictitious name at a nonexistent address.

 The government argues that appellants lack standing to attack the search of the Oldsmobile. Appellants Christopher and Dinsio do lack standing. Suppression of a search "can be successfully urged only by those whose rights were violated by the search itself, not by those who are aggrieved solely by the introduction of damaging evidence." Alderman v. United States, 1969, 394 U.S. 165, 171–172, 89 S.Ct. 961, 965, 22 L. Ed.2d 176. *See also,* Jones v. United States, 1960, 362 U.S. 257, 261, 80 S.Ct. 725, 4 L.Ed.2d 697; Diaz-Rosendo v. United States, 9 Cir., 1966, 357 F.2d 124, 130–134, cert. denied, 1966, 385 U.S. 856, 87 S.Ct. 104, 17 L.Ed.2d 83.

As to Mulligan, the government presents four reasons why he has no standing:

1. He had no control over the Oldsmobile when it was searched.

2. He was not present during the search.

3. He was not the registered owner of the Oldsmobile.

4. He had surrendered possession of the car to Dawson for over two months before the search.

 The standard for standing was stated in *Jones, supra:* "In order to qualify as a 'person aggrieved by an unlawful search and seizure' [*see* Fed.R. Crim.P. 41(e)] one must have been a victim of a search or seizure, one against whom the search was directed . . . ." 362 U.S. at 261, 80 S.Ct. at

---

2. *See also* United States v. Lucarz, 9 Cir., 1970, 430 F.2d 1051, 1055:

"The situation here does not differ markedly from other cases wherein this court and others . . . have upheld searches although the nexus between the items to be seized and the place to be searched rested not on direct observation, as in the normal search-and-seizure case, but on the type of crime, the nature of the missing items, the extent of the suspect's opportunity for concealment, and normal inferences as to where a criminal would be likely to hide stolen property."

3. Spinelli v. United States, 1969, 393 U.S. 410, 419, 89 S.Ct. 584, 590, 21 L.Ed.2d 637; *see also* Beck v. Ohio, 1964, 379 U.S. 89, 96–97, 85 S.Ct. 223, 13 L.Ed.2d 142.

731. The fact that a person neither has control over the premises nor is present during the search does not preclude him from being a victim of that search and seizure. As to the government's third objection, despite the fact that the car was registered under a fictitious name, Mulligan was nevertheless the true proprietor. Concerning the fourth point, Mulligan did not abandon possession of the car; he telephoned Dawson on June 2 to say that he was going to get it on that day. Mulligan has standing to challenge the search.

■ Mulligan argues that the supporting affidavit failed to set forth sufficient facts to establish probable cause.

The affidavit contained the following allegations:

1. There was circumstantial evidence showing that the appellants, all of whom had prior convictions, were in California during March, 1972, and left immediately after the Bank burglary.

2. Mulligan used Dawson's house for a "private meeting" and asked if he could leave his Oldsmobile at Dawson's for three weeks.

3. The car was registered to a fictitious owner at a nonexistent address.

4. In late March, Mulligan told Dawson that he was going to buy some "tools," and drove off in the car. He returned the car the same day, where it remained until the June 2 search.

5. An FBI agent looked through the car windows on June 2 and saw a pair of gloves similar to a pair found at the scene of the burglary as well as a footprint made with a light-colored powdery substance resembling the crushed concrete found in the Bank's vault.

6. Mulligan telephoned Dawson on June 2 to say that he was flying out from Cleveland to get the car.

These allegations meet the constitutional standards of *Aguilar* and *Spinelli, supra*. The affidavit is even stronger than the one supporting the warrant for the search of Dinsio's residence; it shows direct observation of objects similar to those found at the scene of the burglary.

## II. The Admissions of Mulligan and Dinsio—Bruton

■ The trial court, over objection, allowed Dawson to testify to a conversation he had with Mulligan on June 2, 1972, in which Mulligan implied that he was involved in the Bank burglary. The court also admitted, over objection, statements made by Dinsio to one Richard Gabriel at the Los Angeles County Jail after Dinsio's arrest, in which Dinsio admitted his participation in the burglary. The jury was instructed that they were to consider the above statements as evidence only against the declarant and not against any of the co-defendants.

Appellants argue that the admission of these statements violated Bruton v. United States, 1968, 391 U.S. 123, 88 S. Ct. 1620, 20 L.Ed.2d 476. In that case, the Court held that the introduction of an extrajudicial admission of one defendant that implicates or inculpates a co-defendant violates that co-defendant's sixth amendment right to confrontation. Appellants' reliance on *Bruton* is misplaced. Mulligan's statements inculpated only Mulligan. Dinsio's statements inculpated only Dinsio. Appellants ask us to extend the *Bruton* rule to exclude the admission of one defendant even though the admission does not directly implicate a co-defendant. We decline to do so.

There is little danger that a jury in a joint trial, in weighing the evidence against A, will consider against A an admission by B concerning only B's activities. Following the appellants' argument to its logical conclusion would require separate trials in every case where any defendant has made an admission. Such a holding is wholly unwarranted.

## III. The Admissions of Mulligan and Dinsio—Massiah

■ Appellants argue that Mulligan's admission to Dawson and Dinsio's admission to Gabriel violated the rationale and spirit of Massiah v. United States, 1964, 377 U.S. 201, 84 S.Ct. 1199, 12 L.Ed.2d 246. We disagree.

*Massiah* held that a defendant was denied his sixth amendment right to counsel "when there was used against him at his trial evidence of his own incriminating words, which federal agents had deliberately elicited from him after he had been indicted and in the absence of his counsel." 377 U.S. at 206, 84 S.Ct. at 1203. Mulligan's statement was made before he was arrested. The Supreme Court has unequivocally rejected the argument that *Massiah* should be extended to pre-arrest statements. Hoffa v. United States, 1966, 385 U.S. 293, 309–310, 87 S.Ct. 408, 17 L.Ed.2d 374. *Massiah* is also inapposite to Dinsio's statements to Gabriel. *Massiah* excludes only evidence which federal agents elicit from the defendant. 377 U.S. at 206, 84 S.Ct. 1199. It was only after Dinsio admitted participation in the burglary to Gabriel that the latter contacted FBI agents and gave then a statement. Gabriel was not a "creature of law enforcement" when Dinsio confessed to him.

Affirmed.