**UNITED STATES of America, Plaintiff-Appellee.**

v.

**Ennis M. AKIN, Beverly Lloyd Hart, a/k/a James E. Harris, Defendants-Appellants.**

**Nos. 76–2022 and 76–2023.**

United States Court of Appeals, Seventh Circuit.

Argued May 23, 1977.

Decided Sept. 26, 1977.

As Amended Sept. 27, 1977.

Rehearings and Rehearings En Banc Denied Oct. 28, 1977.

Frederic L. Link, San Diego, Cal., Bernard G. Winsberg, David L. Zimmerman, Los Angeles, Cal., for defendants-appellants.

James B. Young, U. S. Atty., Bradley L. Williams, Asst. U. S. Atty., Indianapolis, Ind., for plaintiff-appellee.

Before CASTLE, Senior Circuit Judge, WOOD, Circuit Judge, and MARKEY, Chief Judge.*

* The Honorable Howard T. Markey, Chief Judge of the United States Court of Customs and Patent Appeals, is sitting by designation.

HARLINGTON WOOD, Jr., Circuit Judge.

Bearer bonds and municipal bonds with a face value of $1,491,000 were stolen from MuniciCorp of California on January 27, 1976. Defendants-appellants Ennis Monroe Akin and Beverly Lloyd Hart (hereinafter collectively referred to as defendants) were subsequently found guilty after a trial by jury of violating 18 U.S.C. § 2315.[1] Defendant Hart was found not guilty of the second count of the indictment which alleged that he had transported stolen securities in interstate commerce. Defendants on appeal assert the following: 1) evidence gained from a warrantless search of Akin's hotel room should be suppressed; 2) the district court conducted an insufficient *voir dire* when during the course of trial a newspaper article containing prejudicial information was found in the jury room; 3) the prosecutor engaged in prejudicial misconduct; and 4) the record contains insufficient evidence to support the conviction of defendant Hart.

We find for the following reasons that the convictions of the defendants should be affirmed.

The facts are briefly as follows:

On May 22, 1976, Dean G. Naum, a special agent for the Federal Bureau of Investigation who was posing as Nick Carbone, was introduced to Joseph Kucala. Kucala was using the name Lenny McNamara. This meeting took place at the O'Hare Hilton Coffee Shop in Chicago, Illinois. During this meeting, Kucala indicated that he had municipal bonds and bearer bonds "taken during a score in California." Naum stated that before he could purchase the stolen bonds, he would have to look at the bonds and then check with the people he was working for. Naum stated that he was representing a Latin-American businessman who was interested in purchasing stolen securities.

At 3:30 p. m. that afternoon, Kucala produced xerox copies of the bonds for Naum's examination. After examining the copies of the bonds, Naum offered to purchase the bonds for $170,000. Kucala tried several times unsuccessfully to telephone a contact in California to check on the price.

At 9:20 that evening, Kucala telephoned Naum in his hotel room and stated that his people would accept $200,000 for the bonds. A side agreement was arranged whereby Naum was to tell his people that the bonds would cost $230,000 while he and Kucala split the $30,000 difference. Naum and Kucala tentatively agreed that the transaction could be consummated on the following Tuesday in Indianapolis, Indiana.

At 1:30 or 1:45 a. m. on the morning of May 25, 1976, Kucala and Naum met in the lobby of the Indianapolis Airport Hilton Hotel in Indianapolis, Indiana. Kucala and Naum then went to a coffee shop at the Indianapolis airport to discuss the sale of bonds, Naum stated that the transaction was to be completed in the conference room of a bank. Kucala replied that he would have to check with his people to determine if this was acceptable. Naum and Kucala agreed to meet at 9:00 a. m. in the lobby of the Indianapolis Airport Hilton Hotel.

Kucala testified that at 8:00 a. m. on the morning of May 25, he met with defendants Fusco and Akin in Room 242 of the Indianapolis Airport Hilton Hotel. According to Kucala, both Akin and Fusco expressed reluctance about having the transaction take place in a bank. Kucala also stated that he did not see the bonds while in room 242. He only saw a brown suitcase. According to Kucala, Akin referred to the brown suitcase and stated that only one-half of the bonds were there and that he would have to get the remainder of the bonds. Akin then made a telephone call and instructed someone to "come on over." Moments later there was a knock on the door, a suitcase was handed in to Akin and the door closed. Kucala did not see who handed the suitcase to Akin.

---

1. Jerome James Fusco and Lynn Joseph Kucala were also indicted along with defendants. Kucala pled guilty and testified on behalf of the Government. Fusco was tried and convicted along with defendants but has not joined in this appeal.

Shortly before 9:00 a. m. on May 25, Naum went to the lobby of the Indianapolis Airport Hilton Hotel and waited for Kucala. Naum observed an individual, who he identified at trial as defendant Hart, sitting diagonally across from him. In addition, a second individual who Naum identified as defendant Akin came up to defendant Hart and briefly spoke with him. Kucala entered the lobby several minutes later.

Special Agent Walton, who was posing as a Latin-American businessman for whom Naum was working, and Special Agent Silva, who was acting as Walton's bodyguard, were introduced to Kucala. Naum, Kucala, Walton and Silva then drove to the American Fletcher Bank, Nora Branch. During the drive to the bank, Kucala stated that he would first examine the money at the bank and, if all was in order, return to the hotel for the bonds and then come back to the bank to complete the transaction.

Upon arrival at the bank, Kucala checked the money and then returned to the Indianapolis Airport Hilton Hotel for the bonds, Kucala picked up a brown suitcase at the front desk of the hotel which contained the bonds. As Kucala was about to leave for the bank, he realized that he needed something to put the money in. At that moment, he saw Akin and Fusco walking to the hotel. After explaining his need, Akin gave Kucala his (Akin's) attache case. While still in front of the hotel, Kucala saw Akin and Fusco with a third individual whom he was unable to identify at trial. Kucala returned to the bank and was arrested by agents of the FBI.

After Kucala's arrest, FBI agents searched room 242 at the Indianapolis Airport Hilton Hotel and found the fingerprints of defendants Hart, Fusco, and Akin.

1. Motion to Suppress.

Defendants moved prior to trial to suppress the evidence discovered in the warrantless search of room 242 after the arrest of Kucala. A brief description of the events leading up to the warrantless search of room 242 follows.

Shortly before noon on May 25, 1976, and after Kucala's arrest, FBI agents learned from the desk attendant at the Indianapolis Airport Hilton that defendant Akin, the occupant of room 242, had not yet checked out of the hotel. Special Agents Blackketter, Keenan, Bulmahn, and Boyer then proceeded to room 242 in an effort to find defendant Akin for questioning. The agents found the door to room 242 wide open. Agents Bulmahn and Boyer entered the room looking for a cleaning maid and left when they did not find a maid in the room. Agent Bulmahn stated that although he was in the room for only a brief time, he recalled seeing a number of toilet articles in the bathroom. Agent Blackketter looked in but did not enter the room and then proceeded down the hallway where he saw a cleaning maid's cart. The maid informed Blackketter that she had not yet cleaned room 242 and did not know whether the occupant of that room had checked out.

Thereafter, Blackketter and Keenan went down to the hotel front desk while Bulmahn and Boyer stayed in the hallway outside of room 242. Blackketter and Keenan asked to speak to the person in charge of the hotel and were referred to Susan Kay Cooper, secretary to the General Manager of the hotel. Ms. Cooper indicated that she had authority to act in the absence of the General Manager and brought out the registration card for room 242. The registration card indicated that defendant Akin had rented room 242 for one night and that he had checked in on the evening of May 24. The registration card also reflected that defendant Akin had not yet paid for either the room or for charges from room service.[2] Ms. Cooper did not find any indication that defendant Akin planned to stay in the hotel for an additional day. Neither was there evidence that defendant Akin had permission to leave the hotel and pay at a later date. In response

2. Ms. Cooper at trial testified that a bill for the room was mailed to Akin on June 2 and that payment was not received until June 30, 1976.

to the agents' request to see the room, Ms. Cooper stated that they could enter the room if it was not paid for by 1:00 p. m. Although an individual would not be billed for an additional day until after 6:00 p. m., Ms. Cooper stated at trial that 1:00 p. m. was the hotel check-out time. According to Ms. Cooper, the 1:00 p. m. check-out time enables the maids to make the hotel rooms ready for the new occupants. Ms. Cooper further testified that the maids have pass keys and are instructed to let the housekeeper know whether a room is vacant. Ms. Cooper also stated that although people who rent a room for one day occasionally stay for a longer period of time, they usually let the hotel know in advance of their change in plans.

When room 242 was not paid for by 1:00 p. m., Ms. Cooper at 1:10 p. m. went up to room 242 with the FBI agents. Ms. Cooper found the door to room 242 open, stopped in the doorway and saw no signs of occupancy in the room. Ms. Cooper stated that the rooms are designed so that luggage or clothing hanging in the closet can be seen from the doorway. After concluding that the room was not occupied, Ms. Cooper gave the agents permission to enter the room. The agents found various toilet articles in the bathroom as well as glasses, cups, dishes and discarded papers. Several of these articles as well as latent fingerprints found in room 242 were introduced in evidence.

The district judge denied the motion to suppress finding that the evidence demonstrated that Akin had abandoned the hotel room. The lower court first ruled that room 242 was abandoned at the time of the initial entry shortly before noon when the agents found the door wide open and there was neither luggage in the room nor suits hanging in the closet. In addition, the district judge pointed out that the FBI agents chose not to rely on the abandoned state of the room but rather refrained from undertaking a search until after the check-out time when permission was given by Ms. Cooper.

Although room 242 was rented by and subsequently paid for by defendant Akin, defendant Hart, as well as defendant Akin, asserts that the district court erroneously denied the defendants' motion to suppress. Defendant Hart claims that he has standing to contest the validity of the search of room 242 for two reasons. First, defendant argues that the Government failed to challenge his standing in the district court. We find, however, that on pages 5 and 6 of the Government's Response to Defendant Hart's Pretrial Motions, filed on July 30, 1976, the Government questioned defendant's standing. Defendant Hart, citing *United States v. Mulligan*, 488 F.2d 732 (9th Cir. 1973), *cert. denied*, 417 U.S. 930, 94 S.Ct. 2640, 41 L.Ed.2d 233, also asserts that his motion to suppress is in effect a claim of a proprietary interest in room 242. We cannot agree with defendant's argument on this point. The court in *Mulligan* ruled that although a car was registered under a fictitious name, Mulligan was the true proprietor of the car and therefore had standing to contest the validity of the search of the car. In the present case, however, the record does not show that defendant Hart had any proprietary interest in room 242.

As has often been stated, "suppression of the product of a Fourth Amendment violation can be successfully urged only by those whose rights were violated by the search itself, not by those who are aggrieved solely by the introduction of damaging evidence." *Alderman v. United States*, 394 U.S. 165, 171–2, 89 S.Ct. 961, 965, 22 L.Ed.2d 176 (1969), cited in *United States v. Lisk*, 522 F.2d 228 (7th Cir. 1975), *cert. denied*, 423 U.S. 1078, 96 S.Ct. 865, 47 L.Ed.2d 89. We find that defendant Hart falls in the latter category and, therefore, cannot contest the validity of the search of room 242.

Defendant Akin argues that the district judge erred in denying the motion to suppress for the following reasons: 1) the hotel room was not abandoned at the time of the search; 2) the desk clerk had no authority to consent to the search of the room; and 3) at the time of the search, defendant Akin retained a reasonable expectation of privacy in room 242.

For the following reasons, we find defendant's contentions to be without merit.

"A hotel room can clearly be the object of Fourth Amendment protection as much as a home or an office." *Hoffa v. United States*, 385 U.S. 293, 301, 87 S.Ct. 408, 413, 17 L.Ed.2d 374 (1966). Fourth Amendment protection, however, is dependent on the right to private occupancy of the room since at the conclusion of the rental period, "the guest has completely lost his right to use the room and any privacy associated with it." *United States v. Croft*, 429 F.2d 884, 887 (10th Cir. 1970). At the conclusion of the occupancy period, the hotel manager may enter the room or consent to its search. *United States v. Parizo*, 514 F.2d 52, 54 (2d Cir. 1975). The question of intentional abandonment is, therefore, a necessary inquiry only during the rental period when defendant has "sufficient control over the premises to establish a right to privacy therein." *Parizo*, 514 F.2d at 55.

■ We agree with the district judge that the room was abandoned at the time the FBI agents entered room 242 shortly before noon on May 25. The test for abandonment is whether the complaining party retains a reasonable expectation of privacy in the premises. *United States v. Wilson*, 472 F.2d 901, 902 (9th Cir. 1972), *cert. denied*, 414 U.S. 868, 94 S.Ct. 176, 38 L.Ed.2d 116. Abandonment raises questions of fact and intent of the person who allegedly abandoned the property. *United States v. Minker*, 313 F.2d 632 (3rd Cir. 1962), *cert. denied*, 372 U.S. 953, 83 S.Ct. 952, 9 L.Ed.2d 978; *Friedman v. United States*, 347 F.2d 697 (8th Cir. 1965), *cert. denied*, 382 U.S. 946, 86 S.Ct. 407, 15 L.Ed.2d 354. As the trial judge pointed out, the door of room 242 was wide open and there was neither luggage nor suits in the room. We agree with the district judge that the toilet articles left in the room could have been easily overlooked by defendant Akin and do not, therefore, demonstrate that the room was not abandoned. Nor do we find support for defendant's assertion that the door was left open by a maid for the purpose of making the bed. According to Agent Blackketter, the maid only said that she had not yet cleaned the room. In addition, although defendant was not arrested until early June, 1976, there is no evidence that defendant ever returned to room 242. On the basis of these facts, we cannot say that the district court's conclusion was clearly erroneous.

■ In addition, as the district judge pointed out, the FBI agents waited until permission from Ms. Cooper was obtained after the 1:00 p. m. check-out time to undertake a search of the room. At the time Ms. Cooper consented to the search, rent from the prior day had not been paid and there was neither an indication of occupancy nor arrangements for an extension of the rental period. Since the record supports the district court's conclusion that the rental period ended at the 1:00 p. m. check-out time rather than at 6:00 p. m. when an individual would be billed for an additional day, Ms. Cooper as the authorized representative of the hotel had the authority to consent to the search of the room.

Finally, defendant erroneously relies on *Stoner v. California*, 376 U.S. 483, 84 S.Ct. 889, 11 L.Ed.2d 856 (1964), for the proposition that Ms. Cooper did not have authority to consent to the search of the room. The court in *Stoner* ruled that hotel employees do not possess blanket authority to authorize searches of the rooms of hotel guests. Ms. Cooper's consent in the present case, on the other hand, was given after the expiration of the rental term and was, therefore, proper.

2. Prosecutor's Opening Statement.

The district judge prior to trial instructed the parties not to discuss in opening statement who might have robbed MuniciCorp of the securities. The Government assented to the court's instructions but stated that it would "include in opening argument the fact that the defendant Hart was at MuniciCorp approximately five times before the robbery and did have a friend there by the name of Norton Giffis . . . ." (Tr. 95–6). The district judge replied, "Well, I assume you will be able to prove it." (Tr. 96).

Thereafter, in overruling defendant Hart's objection to the Government's anticipated opening statement linking defendant Hart to MuniciCorp, the district judge more fully explained his ruling:

Well, if this place was robbed, if any of these defendants spent any time there at or about the time of the robbery, I think the Government can show that. That's not to say that showing the defendant had a conversation with somebody, who somebody else says was a robber, and which hasn't been proved in a court of law. (Tr. 100–101).

Thereafter, the Government during opening statement indicated that the following evidence would be introduced:

One last item that will be introduced as evidence is that this man Hart, who was here in Indianapolis registered under the name of Harris at the hotel, had a friend who worked at MuniciCorp by the name of Norton Giffis, and that friend will come here before you and will testify about the visits that Mr. Hart made to MuniciCorp out in California. (Tr. 110–11).

During the course of trial, counsel for defendant Fusco objected to the anticipated testimony of Mr. Giffis. In response to inquiry from the district judge, the Government stated that Mr. Giffis' testimony was material because it showed that defendant Hart was familiar with the scene of the robbery. In addition, the Government stated that Giffis would testify that defendant Hart telephoned him twice on June 13, 1976. According to Giffis, Hart allegedly twice asked whether anyone was looking for him and also stated, "Well, I've got a beef down in San Diego, and I have to turn myself in to my attorney Wednesday." (Tr.

320). In refusing to allow Giffis to testify, the district judge stated that both the importance of defendant Hart's connection with Giffis and the purpose of the June 13 telephone conversation were speculative and neither supported an inference of guilt. (Tr. 320–24, 357). During argument on this point, the following colloquy took place between the court and Mr. Darst, attorney for the Government:

Mr. Darst: Your Honor, we disclosed this to the Court before opening statement.

The Court: Well, you didn't disclose the statement to the Court. You just said in a general way that you had a witness by the name of Giffis who was going to put Mr. Hart in this place of business.

Mr. Darst: That is correct.

The Court: And I naturally assumed that it would be at a time about the time of the robbery, where it could be inferred, for example, that he was casing the joint or some such thing. (Tr. 322).

Defendant Hart argues that the Government knew before trial that Giffis' testimony did not show a recent and probative connection between defendant and MuniciCorp. Citing ABA Standards, the Prosecution Function § 5.5 (1971) [3] and Fed.R.Evid. 103(c),[4] defendant Hart asserts that the Government improperly misled the court into believing that evidence from Giffis' testimony would support the inference that defendant was casing the scene of the robbery prior to the robbery. Defendant further contends that although the court instructed the jury that arguments of counsel were not to be considered as evidence, failure of Giffis to testify left the jury with the

---

3. ABA Standards, The Prosecution Function § 5.5 provides as follows:

In his opening statement the prosecutor should confine his remarks to evidence he intends to offer which he believes in good faith will be available and admissible and a brief statement of the issues in the case. It is unprofessional conduct to allude to any evidence unless there is a good faith and reasonable basis for believing that such evidence will be tendered and admitted in evidence.

4. Fed.R.Evid. 103(c) provides:

(c) hearing of jury. In jury cases, proceedings shall be conducted, to the extent practicable, so as to prevent inadmissible evidence from being suggested to the jury by any means, such as making statements or offers of proof or asking questions in the hearing of the jury.

impression that Government evidence linking defendant Hart to the robbery was not being presented because of opposition by defendant. Defendant Hart concludes that since only circumstantial evidence implicated him in the crime charged, the Government's improper remarks were not harmless error.

 Where a statement by the Government in opening argument is not substantiated at trial because of a subsequent ruling by the trial judge, both the good faith on the part of the prosecution and the impact of the statements in the context of the particular trial must be assessed.[5] *United States v. Prieto*, 505 F.2d 8, 12 (5th Cir. 1974); *United States v. Wallace*, 453 F.2d 420, 422 (8th Cir. 1972), *cert. denied*, 406 U.S. 961, 92 S.Ct. 2072, 32 L.Ed.2d 348. Contrary to defendant's argument in the present case, we find in the record no evidence of bad faith or professional misconduct on the part of the Government since, at the time of its opening statement, it was not unreasonable for the Government to believe that Giffis' testimony would be allowed into evidence. See *Frazier v. Cupp*, 394 U.S. 731, 736–37, 89 S.Ct. 1420, 22 L.Ed.2d 684 (1969). In addition, we do not find that defendant's case was prejudiced as a result of the Government's mention in opening argument of the anticipated testimony of Giffis. The Government's reference to Giffis' testimony was brief and not given undue emphasis. See *United States v. West*, 486 F.2d 468, 472 (6th Cir. 1973), *cert. denied*, 416 U.S. 955, 94 S.Ct. 1968, 40 L.Ed.2d 305. In addition, the jury was expressly instructed not to consider statements by counsel as evidence. *Frazier v. Cupp*, 394 U.S. at 735, 89 S.Ct. 1420. Furthermore, although defendants objected to

Giffis' testimony, defendants failed to point out to the trial judge the alleged error resulting from the unsubstantiated statement in the Government's opening statement and move for that reason for a mistrial, a new trial or a curative instruction. As the court stated in *United States v. Wallace*, 453 F.2d at 422:

> No one should be more cognizant of possible prejudicial trial error at the time of trial than the counsel for a defendant. A reviewing court may consider this circumstance in weighing the alleged prejudicial effect on the jury. Counsel's failure to raise an objection points up the difficulty of our finding prejudicial effect on the jury.

Finally, we think the Government rather than defendant was hurt by this failure of proof. See *United States v. Smith*, 253 F.2d 95, 98 (7th Cir. 1958), *cert. denied*, 357 U.S. 919, 78 S.Ct. 1360, 2 L.Ed.2d 1364.

Thus, for the foregoing reasons, we find that the impact of this statement on the trial was *de minimis*. As the court stated in *Frazier v. Cupp*, 394 U.S. at 736, 89 S.Ct. at 1423:

> . . . It may be that some remarks included in an opening or closing statement could be so prejudicial that a finding of error, or even constitutional error, would be unavoidable. But here we have no more than an objective summary of evidence which the prosecutor reasonably expected to produce. Many things might happen during the course of the trial which would prevent the presentation of all the evidence described in advance. Certainly not every variance between the advance description and the actual presentation constitutes reversible error, when a proper limiting instruction has been given.

---

5. Mr. Chief Justice Burger recently described the purpose and scope of opening statement as follows:

> An opening statement has a narrow purpose and scope. It is to state what evidence will be presented, to make it easier for the jurors to understand what is to follow, and to relate parts of the evidence and testimony to the whole; it is not an occasion for argument. To make statements which will not or cannot be supported by proof is, if it relates

to significant elements of the case, professional misconduct. Moreover, it is fundamentally unfair to an opposing party to allow an attorney, with the standing and prestige inherent in being an officer of the court, to present to the jury statements not susceptible of proof but intended to influence the jury in reaching a verdict.

*United States v. Dinitz*, 424 U.S. 600, 612, 96 S.Ct. 1075, 1082, 47 L.Ed.2d 267 (1976) (concurring opinion).

3. Sufficiency of Evidence Supporting Defendant Hart's Conviction.

■ Defendant Hart asserts that the record contains insufficient evidence to support his conviction. Defendant contends that the Government failed to prove that defendant was either associated with or a participant in the criminal venture.

Viewing the evidence in a light most favorable to the Government, *United States v. Kelly*, 527 F.2d 961, 965 (9th Cir. 1976), we find that there was sufficient evidence for the jury to find defendant guilty of the crime charged in count 1.

First, defendant Hart's fingerprints were found in room 242 along with the fingerprints of defendants Akin and Fusco. In addition, hotel reservations for defendants Hart, Akin, and Fusco were all made by Akin's wife, Eugenia. The evidence further showed that defendant Hart registered under the false name of Harris at the Indiana Hilton Hotel. The parties stipulated at trial that Harris' handwriting matched defendant Hart's handwriting. The evidence also demonstrated that after defendant Hart was mistakenly given a room on the first floor of the hotel, he requested to be moved to a room on the second floor where defendants Akin and Fusco had rooms because "they were, working close together and they had work to do." (Tr. 258). Similarly, Agent Naum saw defendants Hart and Akin conversing in the lobby of the Indianapolis Airport Hilton Hotel on the morning of May 25, 1976. There was also evidence which showed that telephone calls were exchanged between defendants Hart and Akin. Furthermore, at the time defendant Hart was arrested, Eugenia Akin's telephone number was found in his wallet.

The evidence already referred to must be viewed in the context of additional proof which demonstrated that an individual in addition to Akin, Fusco and Kucala was involved in this criminal transaction. For example, Kucala testified that moments after Akin made his telephone call, an unidentified individual handed a suitcase filled with stolen bonds to Akin in room 242 on the morning of May 25, 1976. As has already been stated, defendant Hart's room was in close proximity to room 242. In addition, Kucala stated that he saw an unidentified man with Akin and Fusco in front of the Indianapolis Airport Hilton just before he (Kucala) returned to the bank with the stolen bonds.

As this court stated in *Kelly*, 527 F.2d at 965:

. . . we must accept the tenet that all reasonable inferences supporting the verdict are in favor of the government . . . and that it is the exclusive function of the jury to determine the credibility of the witnesses, resolve evidentiary conflicts and draw reasonable inferences from proven facts.

In light of the evidence which we have summarized, we find that there was sufficient evidence for the jury to conclude that defendant Hart was the fourth participant in this criminal venture.

4. Prejudicial Publicity.

The *Indianapolis Star* on August 20, 1976, printed an article with the headline, "Three men refused acquittal in bonds case." The article stated in part, "However, Judge Dillin ruled he felt the Government had very little difficulty in proving each and all defendants guilty beyond a reasonable doubt." Defendants requested that the trial judge question each juror individually and outside of the presence of each other as to whether they had read this article. The district judge refused stating that individual interrogation would be appropriate only if any of the jurors had read the article. The court thereafter collectively questioned the jury and determined that no juror had read the article in question.[6]

6. The district judge asked the jury the following questions:

By the Court:
1 Q. My first question is: How many of you, if any, subscribe to the Indianapolis

morning newspaper—Indianapolis Star? May I see your hands, please.
(Several hands raised.)

Defendant Akin argues on appeal that the trial judge's failure to interrogate jurors individually constitutes reversible error. Defendant asserts that the collective *voir dire* deprived him of the right to a fair trial and the right of due process of law.

The circuits are split as to the procedure to be followed when possible prejudice from publicity arises during the course of a trial. Our circuit has consistently required the following procedure as set forth in *Margoles v. United States*, 407 F.2d 727, 735 (7th Cir. 1969), *cert. denied*, 396 U.S. 833, 90 S.Ct. 89, 24 L.Ed.2d 84:

> Thus, the procedure required by this Circuit where prejudicial publicity is brought to the court's attention during a trial is that the court must ascertain if any jurors who had been exposed to such publicity had read or heard the same. Such jurors who respond affirmatively must then be examined, individually and outside the presence of the other jurors, to determine the effect of the publicity. However, if no juror indicates, upon inquiry made to the jury collectively, that he has read or heard any of the publicity in question, the judge is not required to proceed further.

See also, *United States v. Battaglia*, 432 F.2d 1115 (7th Cir. 1970), *cert. denied*, 401

U.S. 924, 91 S.Ct. 883, 27 L.Ed.2d 828; *United States v. Thomas*, 463 F.2d 1061 (7th Cir. 1972); *United States v. Barrett*, 505 F.2d 1091 (7th Cir. 1975), *cert. denied*, 421 U.S. 964, 95 S.Ct. 1951, 44 L.Ed.2d 450; *United States v. Rizzo*, 409 F.2d 400 (7th Cir. 1969), *cert. denied*, 396 U.S. 911, 90 S.Ct. 226, 24 L.Ed.2d 187. This approach has also been adopted by the First Circuit in *United States v. Perrotta*, 553 F.2d 247 (1st Cir. 1977), and by the Fourth Circuit in *United States v. Hankish*, 502 F.2d 71 (4th Cir. 1974). Other courts have concluded that each juror should be questioned separately out of the presence of the other jurors. *United States v. Polizzi*, 500 F.2d 856 (9th Cir. 1974), *cert. denied*, 419 U.S. 1120, 95 S.Ct. 802, 42 L.Ed.2d 820; *Silverthorne v. United States*, 400 F.2d 627 (9th Cir. 1968), *cert. denied*, 400 U.S. 1022, 91 S.Ct. 585, 27 L.Ed.2d 633; *United States v. Schrimsher*, 493 F.2d 848 (5th Cir. 1974); *Mares v. United States*, 383 F.2d 805 (10th Cir. 1967), *cert. denied*, 394 U.S. 963, 89 S.Ct. 1314, 22 L.Ed.2d 564; *Hall v. United States*, 396 F.2d 428 (10th Cir. 1968), *cert. denied*, 393 U.S. 986, 89 S.Ct. 462, 21 L.Ed.2d 447; *Coppedge v. United States*, 106 U.S.App.D.C. 275, 272 F.2d 504 (1959), *cert. denied*, 368 U.S. 855, 82 S.Ct. 92, 7 L.Ed.2d 52.[7] See also, ABA Standards, Fair Trial and Free Press § 3.5(f) (1968).[8]

---

2 Q. Okay. Three, six—seven. How many of you read your paper this morning, if any?

A. (J–7) I glanced at it.

3 Q. You glanced at it. No one else read the morning Star at all; is that it?

A. (J–9) Just a little bit.

4 Q. Anyone bring it in to the jury room this morning?

A. (J–7) I did.

5 Q. Yours is back there. All right. Anybody else?

(No response.)

6 Q. All right. You have the paper, and glanced at it Mrs. Rhodes, is it?

A. (J–9) Just the front page.

7 Q. Well, there was a little item back on page 7 about this trial which has an inaccurate statement in it. Did either one of you ladies read that?

A. (Jurors 7 and 9 shook their heads.)

8 Q. Did not read it all. Okay.

The Court: All right, We are going—Since this item is in there, I guess we are going to

have to remove your paper from the jury room. Well, we will remove page 7.

. . . . .

(Tr. 459–60).

7. As has been indicated, the Fifth Circuit in *Schrimsher* and the Tenth Circuit in *Hall* expressed a preference for individual questioning of jurors outside of the presence of other jurors. In both cases, the collective inquiry made by the district judge was found not to be prejudicial error under the circumstances.

8. ABA Standards, Fair Trial and Free Press § 3.5(f) provides:

(f) Questioning jurors about exposure to potentially prejudicial material in the course of the trial; standard for excusing a juror.

If it is determined that material disseminated during the trial goes beyond the record on which the case is to be submitted to the jury and raises serious questions of possible prejudice, the court may on its own motion or shall on motion of either party question each juror, out of the presence of the others, about

As defendant points out, this case differs factually from *Margoles* in that defendant in *Margoles* requested that the jury be polled either individually or collectively while defendants in the present case requested only that the jurors be individually questioned. We do not find that this difference requires this court to adopt a different procedure.

■ We are not, as defendant suggests, following an inflexible procedure which may be inadequate for certain situations. As this court stated in *United States v. Barrett*, 505 F.2d at 1100:

Each case of alleged prejudicial publicity must rest on its "special facts." *United States v. Jannsen*, 339 F.2d 916, 920 (7th Cir. 1964). "The severity of the threat depends upon both the nature of the information so publicized and the degree of juror exposure to it. Moreover, the judge's response is to be commensurate with the severity of the threat posed." *United States v. Thomas*, 463 F.2d 1061, 1063 (7th Cir. 1972).

Thus, a different procedure might be appropriate under special circumstances. See *Rizzo*, 409 F.2d at 402. We agree with the First Circuit's statement in *Perrotta*, 553 F.2d at 250, n. 6, that a district judge may conclude in the exercise of his sound discretion and under the particular circumstances of a case that the situation is one "where individual inquiry will be the preferred course from the outset, just as in less sensitive situations collective inquiry will be more economical of time and less distracting."

■ We find that the district judge under the circumstances of this case did not abuse his discretion in collectively questioning the jury and proceeding no further. The article which contained the prejudicial material appeared on page seven of the *Indianapolis Star*. Neither of the jurors who read the paper on the morning of August 20 indicated that they had seen the prejudicial article. We find no reason to disbelieve their response. This is especially true in light of the fact that the court repeatedly admonished the jury not to read newspaper accounts of the trial. (Tr. 170, 268, 337, 435, 510). Under these circumstances, the district judge was not required to proceed further. *United States v. Solomon*, 422 F.2d 1110, 1116–17 (7th Cir. 1970), *cert. denied*, 399 U.S. 911, 90 S.Ct. 2201, 26 L.Ed.2d 565; *United States v. Daddano*, 432 F.2d 1119 (7th Cir. 1970), *cert. denied*, 402 U.S. 905, 91 S.Ct. 1366, 28 L.Ed.2d 645.

5. Government's Questioning of Witness Kucala.

■ Defendant Akin contends that the Government committed reversible error during its direct examination of Kucala. First, defendant Akin argues that the leading question asked of Kucala by counsel for the Government prejudicially intimated that Kucala had spoken with Akin during his negotiations with Agent Naum. After reviewing the record, we cannot say that the leading questions asked by the Government prejudiced defendant Akin's trial. Akin's name was not mentioned in the complained of portion of the transcript. Furthermore, we cannot understand how any intimation of Akin's involvement in the negotiations was prejudicial in light of Kucala's testimony which consistently described defendant Akin as being deeply involved in this criminal venture.

■ Defendant Akin also complains that the Government improperly refreshed the recollection of Kucala with prior statements of Kucala. We cannot find any prej-

his exposure to that material. The examination shall take place in the presence of counsel, and an accurate record of the examination shall be kept. The standard for excusing a juror who is challenged on the basis of such exposure shall be the same as the standard of acceptability recommended in section 3.4(b), above, except that a juror who has seen or heard reports of potentially prejudi-

cial material shall be excused if reference to the material in question at the trial itself would have required a mistrial to be declared.

The court in *United States v. Hankish*, 502 F.2d at 77, after considering § 3.5(f) stated, "We believe this recommendation has merit but goes too far."

udice to defendant Akin in the complained of portion of the transcript.

## CONCLUSION

For the forgoing reasons, the convictions of defendants Hart and Akin are hereby affirmed.