Phillip Bruce CHRISTOPHER,
Petitioner-Appellant,

v.

U. S. BOARD OF PAROLE et al.,
Respondents-Appellees.

No. 77–1610.

United States Court of Appeals,
Seventh Circuit.

Argued Nov. 8, 1977.
Decided Dec. 29, 1978.

Swygert, Circuit Judge, dissented and filed opinion.

Howard S. Siegrist, Southfield, Mich., for petitioner-appellant.

Patrick J. Glynn, U. S. Dept. of Justice, Washington, D. C., for respondents-appellees.

Before FAIRCHILD, Chief Judge, and SWYGERT and PELL, Circuit Judges.

PELL, Circuit Judge.

The appellant, Phillip Bruce Christopher, appeals from the district court's judgment denying and dismissing his habeas corpus petition. The principal issue raised in this appeal concerns the extent, if any, that Fifth Amendment due process rights are involved in the revocation of a federal prisoner's parole grant.[1]

I.

Petitioner Phillip Christopher is serving a twenty-year sentence at the United States Penitentiary at Terre Haute, Indiana.[2] He has been a well-behaved inmate since arriving at the prison in July 1972. His case manager characterized his institutional adjustment and attitude as "excellent," noting that Christopher "work[s] diligently on his assigned duties" and "participate[s] in some self-improvement activities." After being transferred to the prison's honor camp in February 1975, Christopher was recommended for release on parole by his case manager.

On October 7, 1975, the United States Board of Parole (now the Parole Commission) granted Christopher parole effective February 10, 1976. Preparatory to his actu-

---

1. More correctly what is involved here is what could be termed an inchoate grant of parole. 28 C.F.R. Section 2.30(a) (now 2.229(a)) provides that a "grant to parole shall not be deemed to be effective until a certificate of parole has been delivered to the prisoner." There is no dispute in the present case that Christopher's parole grant had not yet been formally executed and therefore was subject to rescission prior to its effective date which had not yet been reached in Christopher's case. For convenience of reference, however, we shall use herein the term "parole grant."

2. On July 10, 1972 Christopher was given a ten-year sentence by the United States District Court for the Northern District of Ohio for violating the terms of his probation. Later that year he was also found guilty of conspiracy and bank burglary and was sentenced by the United States District Court for the Central District of California to a term of twenty years, to run concurrently with the ten-year sentence. The California conviction was affirmed *sub nom. United States v. Mulligan*, 488 F.2d 732 (9th Cir. 1973), *cert. denied*, 417 U.S. 930, 94 S.Ct. 2640, 41 L.Ed.2d 233 (1974).

al parole Christopher was transferred to a community treatment center in Cleveland, Ohio.

Christopher alleges that in January 1976, while residing at the center, he was approached by a Cleveland newspaper reporter. He refused to be interviewed. The reporter thereupon began writing a series of newspaper articles criticizing Christopher's participation in the program. She also undertook further reportorial investigation of Christopher and his background.[3]

On January 16, 1976, after being informed that the judge who sentenced Christopher, the Federal Bureau of Investigation, and the Cleveland police department were objecting to Christopher's release on parole, Carpenter ordered Christopher's parole be suspended and that a rescission hearing be held.[4] A notice of action was filed against Christopher by the Parole Board on January 28, scheduling a rescission hearing for February. The grounds for the action were that Christopher had engaged in other criminal activity prior to his incarceration in 1972, and that while residing at the treatment center he began reassociating with individuals having a criminal record.[5]

A rescission hearing was conducted before two parole board examiners on February 12, 1976, after Christopher had been returned to the penitentiary at Terre Haute.

In the notice given petitioner he was advised that he could present affidavits and other documentary evidence and be represented by counsel. He did have counsel present. He alleges, however, that he was denied his demand for the personal appearance at the hearing of all persons who had given information against him which is the basis of his principal claim that he was denied due process by virtue of not having the right to confront and cross-examine witnesses against him. He apparently particularly wanted to obtain the appearance of the newspaper reporter, the local prosecuting attorney, and Broeckel. Reasons were not given for the denial. The examiners recommended that Christopher's parole grant be rescinded and that his incarceration be restored. The parole board, having taken the case for original jurisdiction,[6] adopted the examiners' tentative decision on March 9, 1976. Specific reasons were given for the decision.[7] The order was af-

3. In a January 19, 1976 letter to the Chairman of the United States Board of Parole, Lawrence Carpenter, Regional Director of the North Central Region, stated:

On Wednesday, January 14, while I was in Chicago visiting the MCC and the probation office, a reporter from the Cleveland Plain Dealer called the office and talked to Ms. Smith. The reporter, Ms. Woge, advised that persons in the Cleveland community were upset about Mr. Christopher's pending release. She wanted to know why he was released so soon and the names of the examiners who heard the case. Ms. Smith advised that because of the Privacy Act this information could not be furnished. Ms. Woge said that she would get to the bottom of the case, that something smelled about the case, that perhaps a payoff was involved.

4. Carpenter did not specify the reason for this action other than that he had been told "the FBI had information in their file concerning Mr. Christopher [which was] not available to the Board at the time a parole date was established."

5. These grounds were apparently based on a January 23, 1976 letter from the local prosecut-

ing attorney in Cleveland to Carpenter. In the letter the prosecuting attorney stated that he did not pursue possible criminal charges against Christopher because of the California conviction, because Charles Broeckel had named Christopher as being involved in ten crimes in Cleveland and because he had "unverified information" that Christopher was attempting to reestablish contacts with persons having criminal records.

6. Original jurisdiction was involved because Christopher's case received unusual public attention, 28 C.F.R. § 2.17(b)(3), and because he allegedly had been involved in a continuing criminal enterprise prior to his federal incarceration. Section 2.17(b)(2)(B).

7. "Following the parole hearing of October 7, 1975, new information concerning your total offense behavior was made available to the Commission and after careful study it is found that you were engaged in continuous criminal activities in the Cleveland, Ohio area by the statement of Charles Broeckel which stated you were an active participant in the robbery of the Women's Federal Bank; and

firmed on appeal by the full Parole Commission on July 13, 1976. The habeas petition followed.

We have no difficulty in disposing of two of the respondents' contentions: (1) that this action should not be entertained because a similar petition was dismissed by the United States District Court for the Northern District of Ohio, and (2) that the rescission of petitioner's parole grant does not embrace a liberty interest within the meaning of the due process clause.

■ With regard to the first of these contentions, in *Christopher v. Sheriff of Lake County,* No. C 76–50 (N.D.Ohio, January 26, 1976) the district court did dismiss the petition filed by Christopher. A major reason why the district court in Ohio dismissed the first petition was that it was premature, the court stating: [T]o warrant . . . intervention by way of habeas corpus at this point in time [this] court would have to indulge in the presumptions that the Parole Board's review of petitioner's parole will result in a revocation thereof and that such revocation would be without a proper justification. This court cannot make those assumptions . . . ." In concluding its Memorandum and Order, the court said: "In the event that the Parole Board does take the action petitioner postulates is forthcoming, he will have an opportunity to seek review of the same in the proper forum and at the proper time." In view of the foregoing we would not deem it proper exercise of our discretion, *Sanders v. United States,* 373 U.S. 1, 83 S.Ct. 1068, 10 L.Ed.2d 148 (1963) to dismiss this cause because of the Ohio disposition.

The second threshold question is whether petitioner's parole grant embraces a liberty interest at all sufficient to require the application of procedural due process. The respondents contend it does not.

■ The respondents do correctly note that the procedural requirements of due process do not extend to all situations in which governmental action relating to a convict's imprisonment status may be adverse to his interests. Whether a convict has a constitutionally protected liberty interest depends upon whether he has a justifiable expectation that adverse action will not be taken except for misbehavior or upon the occurrence of specified events. *Meachum v. Fano,* 427 U.S. 215, 96 S.Ct. 2532, 49 L.Ed.2d 451 (1976); *Montanye v. Haymes,* 427 U.S. 236, 96 S.Ct. 2543, 49 L.Ed.2d 466 (1976).

■ In our opinion a federal prisoner who has been given an effective date of parole does have some justifiable expectation sufficient to trigger the protections of the Due Process Clause. Unlike an inmate being considered for parole, one who has been given a parole grant, under regulations, has a justifiable expectation of being released on parole on the date set.[8] This right is not absolute however; it is conditioned on the occurrence of certain events. Specifically, release on the scheduled date is "conditioned upon the continued good conduct by the prisoner and the completion of a satisfactory plan for parole supervision," 28 C.F.R. §§ 2.29(c), 2.34(a) (1977), and upon

the ten True Bills naming you an unindicted co-conspirator in the burglaries of the (1) Cleveland Federal Savings and Loan Association; (2) Grand Larceny of the Bi-Rite Supermarket; (3) the Pick-N-Pay Supermarket; (4) Alvin's Jewelers; (5) Sidney's Mens Wear; (6) automobile stealing; (7) Uncle Bill's Discount Store; (8) Supreme Savings and Loan Association; (9) Strakich Realty Co.; (10) Cleveland Industrial Vending Co.; together with the photographs of a .38 Caliber Smith and Wesson revolver (you admitted ownership of a gun, while on federal probation); phosphorous hand grenade (supported by the statement of Detective Rocco M. Pollutro, Cleveland Police Department) and two A.D.T.

Alarm Boxes which items were found in your periodic residence (897 Rudyard Avenue) as a result of a search warrant dated June 21, 1972."

8. Although an inmate being considered for parole does not have a *per se* right to be released on parole, *see Franklin v. Shields,* 569 F.2d 784, 788 n.4 (4th Cir. 1977), *cert. denied,* 435 U.S. 1003, 98 S.Ct. 1659, 56 L.Ed.2d 92 (1978), he does have a right to be considered for parole. Further, he should not be denied parole for false, insufficient, or capricious reasons. *See Cox v. Benson,* 548 F.2d 186, 188 (7th Cir. 1977).

the absence of "new information adverse to the prisoner regarding matters other than institutional misconduct." 28 C.F.R. §§ 2.34(b), 2.54(b) (1977).[9] Because rescission is limited to the occurrence of specified events, some due process applies.

Finally, we should note that this circuit,[10] along with a majority of other circuits which have considered the question,[11] has held that the minimal requirements of due process attach to parole release decisions. It would seem anomalous to hold that some due process applies to that kind of proceeding but does not apply once a parole date has been set and rescission is contemplated. In the present case, as contrasted with an inmate who is denied parole and therefore remains in the same custodial situation as before, Christopher, although in a custodial status while residing at the community treatment center, was subjected to a curtailing change in liberty upon his post-rescission return to prison. We conclude that the minimum requirements of procedural due process appropriate for the circumstances must be observed.

The district court, although placing some limitation on the extent of the due process hearing, agreed with the conclusion which we have reached:

> It would appear from the regulations, statutes and decisions that a prisoner such as Petitioner who has been given a future date certain for parole and who

has been permitted to be transferred to a community treatment center until said date is not a parolee and therefore not entitled to a full *Morrissey [Morrissey v. Brewer,* 408 U.S. 471, 92 S.Ct. 2593, 33 L.Ed.2d 484 (1972)] hearing. However, it is also apparent that fairness and due process would require some hearing similar to that required by the United States Supreme Court in *Wolff v. McDonnell,* 418 U.S. 539, 94 S.Ct. 2963, 41 L.Ed.2d 935 [1974] regarding prison disciplinary cases. The hearing received by Petitioner in this case met the requirements of that case.

There appears to be no real contention that the process received by Christopher did not satisfy the *McDonnell* requirements. These are by way of summary, as follows: (1) advance notice of the information to be considered at the hearing; (2) a written statement of the evidence relied on and reasons for the decision; (3) the right of the prisoner to be present; (4) the right to present documentary evidence on his behalf; (5) a qualified right to have a representative present to aid the prisoner in presenting his case; and (6) a qualified right to call witnesses and present documentary evidence in his defense.

In some respects the hearing accorded Christopher exceeded the *McDonnell* requirements. In that case the Court was not prepared to hold that inmates had a right to

---

**9.** The Government also argues that a parole grant may be rescinded by the provisions in 28 C.F.R. § 2.54 (1977). This section is not substantive in nature. Rather, it merely sets up a mechanism whereby the Attorney General or the full Commission may, under certain circumstances, obtain review of the Regional Commissioner's decision.

**10.** *United States ex rel. Richerson v. Wolff,* 525 F.2d 797 (7th Cir. 1975), *cert. denied,* 425 U.S. 914, 96 S.Ct. 1511, 47 L.Ed.2d 764 (1976). *Cf. King v. United States,* 492 F.2d 1337 (7th Cir. 1974). The Government urges that we reconsider *Richerson* in light of the Supreme Court's subsequent rulings in *Meachum v. Fano,* 427 U.S. 215, 96 S.Ct. 2532, 49 L.Ed.2d 451 (1976), and *Montanye v. Haymes,* 427 U.S. 236, 96 S.Ct. 2543, 49 L.Ed.2d 451 (1976). We decline the Government's invitation. This court has consistently adhered to *Richerson, see, e. g., Garcia v. United States Board of Parole,* 577

F.2d 100, 105 (7th Cir. 1977), and a majority of the circuits have affirmed its validity. *See* note 11 *infra.*

**11.** *See Inmates of the Nebraska Penal and Correctional Complex v. Greenholtz,* 576 F.2d 1274 (8th Cir. 1978); *Franklin v. Shields,* 569 F.2d 784, 800 (4th Cir. 1978) *(en banc); Fronczak v. Warden,* 553 F.2d 1219 (10th Cir. 1977); *Zurak v. Regan,* 550 F.2d 86 (2d Cir. 1977), *cert. denied,* 433 U.S. 914, 97 S.Ct. 2988, 53 L.Ed.2d 1101; *Hill v. Attorney General,* 550 F.2d 901 (3d Cir. 1977); *Childs v. United States Board of Parole,* 167 U.S.App.D.C. 268, 511 F.2d 1270 (1974). *Contra, Scott v. Kentucky Parole Bd.,* No. 74-1899 (6th Cir. Jan. 15, 1975), *on remand sub nom. Bell v. Kentucky Parole Bd.,* 556 F.2d 805 (6th Cir. 1977); *Scarpa v. United States Bd. of Parole,* 477 F.2d 278 (5th Cir.) *(en banc), vacated and remanded to consider mootness,* 414 U.S. 809, 94 S.Ct. 79, 38 L.Ed.2d 44, *dismissed as moot,* 501 F.2d 992 (5th Cir. 1973).

either retained or appointed counsel, 418 U.S. 570, 94 S.Ct. 2963, although Christopher did have retained counsel. He also was permitted to submit documentary evidence by way of affidavits. His complaint is not that he did not receive various component aspects of procedural due process but rather he was entitled to much more and "being virtually a 'parolee,' he would be entitled to protections and guarantees of a full *Morrissey v. Brewer* hearing." This brings us then to the essence of his claim which is that he was denied the right to confront his accusers and cross-examine them. Presumably this would have meant calling them as adverse witnesses.

■ The district court in accepting the *McDonnell* requirements as guidelines did not indicate that that was a case involving the rescission of a parole grant which, of course, it was not, that case involving disciplinary proceedings in the prison context. We, as apparently did the district court, regard the factual situation here as having analogous application in the determination of the amount and extent of due process available to the yet-prisoner who is confronted with the possibility of having a grant of parole rescinded before it has become effective. More importantly, however, we regard *McDonnell* as illustrating a middle ground in the panoply of due process rights. In the area of the prisoner situation and its allied field of parole, the due process requirements as stated by this court in *United States ex rel. Richerson v. Wolff*, 525 F.2d 797, 805 (7th Cir. 1975), *cert. denied*, 425 U.S. 914, 96 S.Ct. 1511, 47 L.Ed.2d 764 (1976), "are neither 'an inflexible structure' (*Morrissey v. Brewer*, 408 U.S. at 409, 92 S.Ct. 2593 (Brennan, J., concurring)) nor 'graven in stone' (*Wolff v. McDonald*, 418 U.S. at 572, 94 S.Ct. 2963) . . . ." The range of the due process rights run from being virtually non-existent, exemplified in prison transfer cases, even those having a substantial adverse impact on the prisoner exemplified by *Fano* and *Haymes, supra*, to *Morrissey* upon which Christopher places his principal reliance. The Court in *Fano* rejected "at the outset the notion *any* grievous loss visited upon a person by the State

is sufficient to invoke the procedural protections of the Due Process Clause." 427 U.S. at 224, 96 S.Ct. at 2538 (emphasis in the original). Even in *Morrissey*, however, where the parole had become effective and the parolee had been relying "on at least an implicit promise that parole will be revoked only if he fails to live up to the parole conditions," 408 U.S. at 482, 92 S.Ct. at 2601, the Court goes no farther than to find that what is needed is an *informal hearing*. The Court did not reach or decide the question of whether the parolee is entitled to the assistance of counsel. The question was reached a short time later in *Gagnon v. Scarpelli*, 411 U.S. 778, 93 S.Ct. 1756, 36 L.Ed.2d 656 (1973), but the decision recognized only a limited right of counsel.

■ In essence under our reading of the various cases it appears to us that the point at which a particular parole or prisoner situation falls within the range of formality of hearing is dependent upon the extent to which a person's government-created right is being arbitrarily abrogated. A balancing must be accomplished between often competing governmental and individual interests.

In discussing the fact that due process is flexible and calls for such procedural protections as the particular situation demands and that it, unlike some legal rules, is not a technical conception with a fixed content unrelated to time, place, and circumstances, the Supreme Court has found in prior decisions that identification of the specific dictates of due process generally requires consideration of three distinct factors:

First, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest, including the function involved, and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail.

*Mathews v. Eldridge*, 424 U.S. 319, 335, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976). This specific question which we must resolve in balancing these competing factors is whether a federal convict who has been given a parole date and prior to the effective date being reached is subject to less than complete custody, such as the community treatment center situation here involved, may have the tentative grant of the parole rescinded without the right to confront and cross-examine adverse witnesses.

There can be certainly little question that one in the position of Christopher who can see the gates of freedom imminently ahead of him and who finds them shut almost in his face will suffer a keen sense of disappointment. This no doubt is true even though subjectively he may be aware of facts, apparently unknown to the paroling authorities, which he should realize might have substantially militated against a parole date being granted to him if such facts had been known. Of course, there is also the fact that not only will he not have immediate freedom but his parole eligibility will be retarded for some period which may well range beyond a year. We would agree that from Christopher's point of view it is very important that the rescission decision not be based on inaccurate information or an erroneous evaluation. That, of course, is true in any one of the prisoner situations which the Supreme Court has considered, whether it is the prisoner who is transferred to a less desirable place of confinement or whether it is a prisoner who loses good time credit in a disciplinary proceeding. Indeed it is a desirable element of every decisional process in which people's lives or fortunes are affected. Nevertheless, because of the competing governmental interest, the balancing process may indicate that something less than a full panoply of due process rights is all that is required.

In that balancing, it is clear that the Government's interest in whether a parole grant will be rescinded is substantial. In any parole situation, the sentence which was deemed appropriate for the individual involved still has time to run. When the grant of a parole has become effective, the prisoner, even though in custody in a technical sense, has been restored to a relatively complete freedom in society. If he is removed from that status, then under *Morrissey* he is entitled to a fuller panoply of due process procedures including the right of confronting and cross-examining adverse witnesses. In the situation, however, where the parole grant has not become effective, even though as here the prisoner has been permitted some freedom of movement in society, he is still essentially in physical custody. Because Christopher was enjoying some freedom of release while awaiting actual parole he argues in effect that his interest is greater than the prisoner in *McDonnell* whose anticipatory release date was being extended by the loss of good time. Christopher argues therefore that his interest is in fact analogous to a revocation of parole but his conditional liberty and conditional entitlement to release is merely that—conditional. It is conditional on compliance with 28 C.F.R. 2.34. Here Christopher did not have any sort of a vested liberty interest but only an anticipatory interest.

In *Morrissey* the Supreme Court, after discussing the restrictions placed on a parolee but deciding that his condition is very different from that of confinement, noted, quoting *United States ex rel. Bey v. Connecticut Board of Parole*, 443 F.2d 1079, 1086 (2d Cir. 1971), that

It is not sophistic to attach greater importance to a person's justifiable reliance in maintaining his conditional freedom so long as he abides by the conditions of his release, than to *his mere anticipation or hope of freedom.*

*Morrissey, supra,* 408 U.S. at 482 n.8, 92 S.Ct. at 2601. (Emphasis added.)

In view of the quite conditional and anticipatory nature of the freedom of a person in Christopher's situation, it is apparent that the Government has a substantial interest in accomplishing rescission without the burden of an adversary trial if it is discovered that the prisoner has failed to abide by the rules of his pre-parole re-

lease program or is otherwise an improper candidate for that status. Certainly because his parole grant had not yet been formally executed, the Government has a particular interest in rescinding its initial decision if its allowance is based on false premises. While the Government should be alert and desirous of not keeping imprisoned a person beyond the time when all purposes of incarceration have been served it also has a very definite interest in rescinding an improper determination because it is the public which suffers when a convicted criminal, who should not have, reaches the freedom of an effective parole.

■ Christopher argues here, however, that *McDonnell* should not be applicable because of the Court's emphasis in that case, and in *Baxter v. Palmigiano*, 425 U.S. 308, 96 S.Ct. 1551, 47 L.Ed.2d 810 (1976), on the inherent danger of fully adversary proceedings in the prison complex involving testimony by inmates as it necessarily would. Here Christopher argues that the witnesses are outside persons and that therefore there are none of the dangers which were emphasized in *McDonnell*. We agree that the situation is different but we also are of the opinion that the burden of a full adversary proceeding at the stage of an incomplete or ineffective parole grant unduly adds to the governmental burden in the balancing of the factors listed in *Mathews v. Eldridge, supra.* That which the district court's allowance of due process permitted to Christopher included the right of counsel and the submission of affidavits. This in our opinion made the process of his rescission sufficiently "due" to support the determination arrived at by the appropriate authorities.

Our primary consideration in this decision has been upon Supreme Court cases involving the prisoner context, some of which are related to parole and some of which are not but none of which involved directly the point of status at which Christopher had arrived. Nevertheless, these cases do lay down guidelines to the effect that the underlying circumstances will control the measure of fullness of due process proce-

dures to which an individual claimant will be entitled. In our opinion, Christopher has not demonstrated that he has reached the status which the *Morrissey* parolee has realized.

We have found no authority squarely in point. The cases which come closest to being so either do not precisely involve the factual situation here or do not analyze the applicable law in any depth. In *McGee v. Aaron*, 523 F.2d 825 (7th Cir. 1975), the prisoner was given a parole hearing and received a tentative parole date from the hearing examiners. This was later reconsidered by the National Appellate Board and parole was denied and continued to the expiration of the sentence. Reasons for denial were given and this court held that due process did not require what would amount to a rehearing and that a rehearing by the Parole Board would not produce benefits commensurate with the burden and duplication of effort it would entail. It is true that the court also pointed out that the prisoner could petition for a writ of habeas corpus if he thought the reasons given were false, insufficient, or capricious. Christopher did petition for habeas corpus but we are not persuaded on the record before us that the reasons given for rescission were either false, insufficient, or capricious.

The Fifth Circuit in *McIntosh v. Woodward*, 514 F.2d 95 (5th Cir. 1975), refused to hold that a petitioner was entitled to the due process procedures of a parole revocation hearing when his parole was scheduled for a future date and the Parole Board rescinded the order for parole. The court there said it was controlled by the pre-*Morrissey* holding of *Sexton v. Wise*, 494 F.2d 1176 (5th Cir. 1974), and did not feel that *McDonnell* overruled *Sexton* in the matter of rescission hearings.

In *Robinson v. Benson*, 570 F.2d 920 (10th Cir. 1978), a prisoner awaiting his parole date to become effective, violated staff rules. In appealing the denial of habeas corpus following the rescission of his parole grant, he raised the question of what due process rights must be afforded in parole rescission proceedings. The court reasoned

that when an effective date of parole has been set by the Commission, release on that date is conditioned on continued good conduct by the prisoner. 28 C.F.R. 2, 34 (1976). These regulations, as we have noted, do not provide for an opportunity to call witnesses or to confront and cross-examine adverse witnesses. The court held in *Robinson* that the petitioner had more than a mere anticipation of freedom—he had a concrete expectation of freedom contingent on continued good behavior. Therefore, he was entitled to *McDonnell* minimum due process procedures. But because he was not actually released and not yet enjoying the liberty interest of a prisoner on parole as in *Morrissey*, full due process procedures would not apply. The court held unhesitatingly that "the opportunity to call and cross-examine witnesses is not absolutely essential in a parole rescission proceeding to satisfy due process." *Robinson* at 923.

In sum, for the reasons given herein we hold that Christopher, by not being entitled to call adverse witnesses and to cross-examine them, was not denied due process on the facts of this particular case. Here the rescission of Christopher's parole was essentially a decision that parole should not have been granted in the first instance; nevertheless, Christopher received substantially more due process procedures than he might have in the ordinary parole hearing.

We have examined the other contentions raised by Christopher and find them to be without merit. He argues that the referral of his case for an original jurisdiction decision of the Parole Board required a formal hearing with the opportunity to present witnesses in opposition to the referral. The original jurisdiction referral, however, does not adversely affect the prisoner's chances for parole but merely requires that the decision be made by the Parole Board members rather than by hearing examiners. Christopher argues also that the parole was rescinded because of the pressures of adverse newspaper publicity. Irrespective of whether the reporter's zeal may have initiated inquiries, the record does not require the conclusion that the

newspaper pressure was the basis for the actual rescission. We also find without merit the contention that the Parole Board could not use hearsay information of criminal activities not supported by convictions. Paroling authorities are not limited to consideration of formally adjudicated crimes in determining the likelihood of a prisoner's success, if released on parole. *Williams v. New York*, 337 U.S. 241, 69 S.Ct. 1079, 93 L.Ed. 1337 (1949).

Finally, Christopher asserts that this court's decision in *Garafola v. Benson*, 505 F.2d 1212 (7th Cir. 1974), precluded the Parole Board from rescinding his parole on the basis of information about his prior criminal activity. *Garafola* cannot be read so broadly. *Garafola* was merely a procedural decision, which required that the Parole Board give meaningful consideration to parole under 18 U.S.C. § 4208(a)(2) prior to the time the Board would have done so if the prisoner had been sentenced under 18 U.S.C. § 4202 (one-third of the term). The *Garafola* hearing requirement has been satisfied in this case. If the rescission hearing is included, Christopher has now had 3 parole hearings in the first 5 years of his 20-year sentence.

Even if § 4208(a)(2) [now § 4205(b)(2)] requires special review hearings for indeterminate sentences, it does not require that prisoners sentenced under that statute be considered for parole under any different criteria than other prisoners. *Stroud v. Weger*, 380 F.Supp. 897 (M.D.Pa.1974); *Geraghty v. United States Parole Commission*, 429 F.Supp. 737 (M.D.Pa.1977). The existence of a serious criminal background is clearly a proper basis for parole denial and was upheld by this court as a reason for rescission of a parole grant in an "(a)(2)" sentence in *McGee v. Aaron, supra.*

Accordingly, for the reasons set out hereinbefore the judgment of the district court is affirmed.

SWYGERT, Circuit Judge, dissenting.

Although I agree with the majority on all other points, I cannot concur with their

determination that the process due Christopher at the rescission hearing did not include the right to confront and cross-examine adverse witnesses. Although the majority has purported to balance the factors outlined in *Mathews v. Eldridge*, 424 U.S. 319, 335, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976), they have failed to do so upon a scale sufficiently sensitive to the significance of the interests involved.

The private interest affected by the official action here is substantial. Christopher has an interest both in continued conditional release and in obtaining parole status. A rescission proceeding (like a proceeding revoking parole) determines whether Christopher will be free or in prison, "a matter of obvious great moment to him." *Wolff v. McDonnell*, 418 U.S. 539, 560, 94 S.Ct. 2963, 2977, 41 L.Ed.2d 935 (1974). Furthermore, rescission of his parole grant retards his parole eligibility from twenty days to over two years. Clearly the loss entailed by a rescission is grievous. Because of its severity, it is essential to Christopher that the decision to rescind is not based on inaccurate information or an erroneous evaluation.

The Government's interest in the rescission of the parole grant is also substantial. As with a parolee, the Government has an interest in being able to return Christopher to incarceration without the burden of an adversary trial if he has failed to abide by the rules of his pre-parole release program. Furthermore, because Christopher's parole grant had not yet been formally executed, the Government has an additional interest in rescinding its initial decision if its allowance was based on false premises. But the Government also has an interest in the accuracy of rescission determinations. Society suffers when a prisoner is released on parole before he is fully rehabilitated. It equally suffers, however, when he is kept in prison beyond the time when all purposes of incarceration have been served.

Christopher was charged with two separate grounds for rescinding his parole grant: (1) that he violated the rules of the pre-release program by reassociating with individuals with criminal records, and (2) that there was "new" information that he had been engaged in other criminal activity before his conviction in 1972.[1] Rescission of Christopher's parole grant was grounded only on the second charge, a significant point which may not be readily apparent from the majority's recitation of the facts. Primary support for this charge was an unverified written statement by Charles Broeckel wherein he implicated Christopher in a robbery and a number of burglaries. Christopher denied his involvement.

The probative value of requiring confrontation and cross-examination in these circumstances is obvious. Confrontation and cross-examination guarantee that the fact finding process is as complete and reliable as possible. As Mr. Chief Justice Burger has noted: "[c]ross-examination is the principal means by which the believability of a witness and the truth of his testimony are tested." *Davis v. Alaska*, 415 U.S. 308, 316, 94 S.Ct. 1105, 1110, 39 L.Ed.2d 347 (1974). The Supreme Court in other cases has recognized that "[i]n almost every setting where important decisions turn on questions of fact, due process requires an opportunity to confront and cross-examine adverse witnesses." *Goldberg v. Kelly*, 397 U.S. 254, 269, 90 S.Ct. 1011, 25 L.Ed.2d 287 (1970). In *Greene v. McElroy*, 360 U.S. 474, 496–97, 79 S.Ct. 1400, 1413, 3 L.Ed.2d 1377 (1959), the Court expounded the right of confrontation in the strongest of terms:

> Certain principles have remained relatively immutable in our jurisprudence. One of these is that where governmental action seriously injures an individual, and the reasonableness of the action depends on fact findings, the evidence used to prove the Government's case must be disclosed to the individual so that he has an opportunity to show that it is untrue.

---

1. None of this information was new in the sense that it occurred after Christopher had been awarded his parole date. Rather, the Government claims that it was new because the information was allegedly not known by the Parole Board at the time of the grant. *See* note 7 of the majority opinion, *supra*.

While this is important in the case of documentary evidence, it is even more important where the evidence consists of the testimony of individuals whose memory might be faulty or who, in fact, might be perjurers or persons motivated by malice, vindictiveness, intolerance, prejudice, or jealousy. We have formalized these protections in the requirements of confrontation and cross-examination. They have ancient roots. They find expression in the Sixth Amendment which provides that in all criminal cases the accused shall enjoy the right "to be confronted with the witnesses against him." This Court has been zealous to protect these rights from erosion. It has spoken out not only in criminal cases . . . but also in all types of cases where administrative and regulatory actions were under scrutiny. (Citations omitted).

Therefore, before a parole grant may be rescinded, a convict has the right to confront and cross-examine adverse witnesses at the hearing if disputed factual issues are involved.[2] That right, however, is not unqualified. The Board may modify or even deny the right completely if it determines that good cause exists. *See Morrissey v. Brewer*, 408 U.S. 471, 487, 489, 92 S.Ct. 2593, 33 L.Ed.2d 484 (1972)[3]. But in such circumstances, the Board must justify the denial by reasons apparent in the record.[4]

It may be noted parenthetically that this case is not like *Baxter v. Palmigiano*, 425 U.S. 308, 96 S.Ct. 1551, 47 L.Ed.2d 810 (1976), where the right to confrontation and cross-examination was rejected in the context of prison disciplinary proceedings. In that case the state had an interest not present here: potential hazards to institutional security, that is, safety of prison personnel and possible reprisal against other inmates, which could develop if inmates were allowed to confront adverse witnesses. 425 U.S. at 320–22, 96 S.Ct. 1551; *see Wolff, supra*, 418 U.S. at 567–69, 94 S.Ct. 2963. Here, Christopher seeks to confront only witnesses who reside and work outside the prison. Thus the Court's concern of avoiding "havoc inside the prison walls" is apparently not present in this case.

The majority recognizes this distinction but does not appreciate its significance. Instead, they simply state in a conclusory fashion that the rights of confrontation and cross-examination would unduly add to the governmental burden. By failing to require the Board to justify its denial by reasons apparent in the record, the majority has failed to require assurances that the countervailing factors present in *Wolff* and *Baxter* are in fact present here. Such a failure indicates an unwillingness to undertake more than a gross balancing of competing interests, thus ignoring the more finely-tuned, case-by-case balancing that

2. The right to confront and cross-examine adverse witnesses does not preclude the use of conventional substitutes for live testimony. Rather, the right means only that there must be an adequate opportunity to rebut the evidence by facing the Government's witnesses. Thus, prison officials or the Parole Board may use written reports to support their charges against an accused inmate, provided that the inmate is given a meaningful opportunity to call the authors of the reports as witnesses and subject them to cross-examination. *See Richardson v. Perales*, 402 U.S. 389, 407, 91 S.Ct. 1420, 28 L.Ed.2d 842 (1971).

3. The observation made by Judge Wood in *Hayes v. Walker*, 555 F.2d 625, 630 (7th Cir.), *cert. denied*, 434 U.S. 959, 98 S.Ct. 491, 54 L.Ed.2d 320 (1977), is apposite:

This court recognizes the need for broad discretion in prison officials in their determination as to whether a prisoner should be

allowed to call witnesses or present affidavits. By requiring that the underlying support for the denial of particular witnesses be reflected in the record of the prison proceedings, we do not mean to unduly interject the court into this aspect of prison decision making. On the contrary, courts should exercise only a limited review of the exercise of prison officials' discretion to ensure that arbitrary decision making is not undertaken.

4. This does not require that a statement of reasons be given to support the denial of a request to confront and cross-examine adverse witnesses. The requirement would only be that some support for the denial of a request appear in the record. This will enable a court to make a limited inquiry into whether the broad discretion of prison officials has been exercised arbitrarily.

*Mathews* requires [5] and that the fundamental nature of the rights involved deserves.

Parole grant rescission hearings, no less than parole revocation proceedings, involved factual determinations. Because the respective interests of both the petitioner and the Government are substantial, due process requires that the risk of an erroneous determination be reduced as much as possible. Here the Board in rescinding the parole grant rejected Christopher's request for confrontation and cross-examination without giving reasons. What reasons, if any, the Board had for that rejection is a matter of utmost importance if the requirements of procedural due process are to be observed. Accordingly, the case should be remanded to the district court for a determination of whether the Board's decision denying confrontation and cross-examination was a proper exercise of its discretion.

I would reverse.

---

**5.** In *Mathews*, the Court called it a "truism" that:

" '[d]ue process,' unlike some legal rules, is not a technical conception with a fixed content unrelated to time, place and circumstances." *Cafeteria Workers v. McElroy*, 367 U.S. 886, 895 [81 S.Ct. 1743, 6 L.Ed.2d 1230]

(1961). "[D]ue process is flexible and calls for such procedural protections as the particular situation demands." *Morrissey v. Brewer*, 408 U.S. 471, 481 [92 S.Ct. 2593, 33 L.Ed.2d 484] (1972).

424 U.S. at 334, 96 S.Ct. at 902.