**UNITED STATES of America, Plaintiff,**

v.

**Ronald Joseph BUTE, Beverly M. Bute and Steven Barnes, Defendants.**

No. 92–CR–0108–S.

United States District Court,
D. Utah, C.D.

June 18, 1993.

David Schwendiman, Kevin Sundwall, Asst. U.S. Attys., U.S. Attys. Office, Salt Lake City, UT, for plaintiff.

Ronald Yengich, Loni F. DeLand, D. Gilbert Athay, Salt Lake City, UT, for defendants.

## ORDER

SAM, District Judge.

This matter is before the court on defendants' Objections to Magistrate's Report and Recommendation.

Defendants were charged with possession of a controlled substance with intent to distribute and manufacture of a controlled substance. The three defendants filed a joint motion to suppress evidence obtained by police claiming it was obtained in violation of the defendants' Fourth Amendment rights.[1] The motion to suppress was referred to the magistrate judge pursuant to 28 U.S.C. § 636(b)(1)(B). The magistrate judge issued a report and recommendation finding that whereas defendants Beverly Bute and Ronald Joseph Bute had standing to contest the search, defendant Steven Barnes did not demonstrate a sufficient expectation of privacy in the premises to confer standing on him. The court concurs.

As to the Bute's motion to suppress, the magistrate judge denied the motion but on grounds different than those suggested by the government. The United States had argued that the search of the honey factory fell within the "protective sweep" exception to warrantless searches and seizures. The magistrate judge rejected this argument finding that the protective sweep concept applies only when there is a "reasonable belief based on specific and articulable facts that the area to be swept harbors an individual posing as a danger to those on the arrest scene." As the officer in this case had no real suspicion that the premises harbored a dangerous individual, the magistrate judge held that a protective sweep was not applicable in this case.

The magistrate judge further found that absent evidence of an emergency situation, the exigent circumstances exception was also not applicable. Notwithstanding his rejection of these two exceptions, he found the warrantless search to be constitutional. The magistrate judge applied a "reasonableness" standard to the search and found that when analyzed under this standard, the search and discovery of evidence was constitutional.

Defendants have objected to the report and recommendation arguing that the magistrate judge adopted a general reasonableness exception to the warrant requirement which is not justified by applicable case law.

The court concurs with the magistrate judge's holding. The court finds there is sufficient authority to support a finding that the officer's actions were protective of the premises, that he had probable cause to perform a cursory search, and that any evidence in plain view which was subsequently seized pursuant to that search should not be suppressed. *See, Reardon v. Wroan,* 811 F.2d 1025, 1029 (7th Cir.1987) (where police are responding to a crime reported to be in progress police judgments should be afforded an extra degree of deference and therefore police were not unreasonable in not getting a warrant); *United States v. Zurosky,* 614 F.2d 779, 784 (1st Cir.1979) *cert. denied* 446 U.S. 967, 100 S.Ct. 2945, 64 L.Ed.2d 826 (1980) (exception to warrant requirement is when there is a compelling need for official action and no time to secure a warrant); *United States v. Moskow,* 588 F.2d 882, 892 (3rd Cir.1978) (police responded to information of surreptitious entry into a vacant building at late hour; merely securing premises from outside may have allowed grave public danger to go uncorrected); *United States v. Estese,* 479 F.2d 1273, 1274 (6th Cir.1973) (evidence found during search for burglar in response to breaking and entering call properly seized and admitted). *But see,*

---

1. The facts of this case are fully set forth in magistrate judge Boyce's report and recommendation.

*United States v. Selberg,* 630 F.2d 1292, 1295 (8th Cir.1980) (implicit in police's belief that person within premises is in need of immediate aid or that property must be protected is principle that there is an emergency threat to life or property).

In the instant case the officer admits that the situation was not such an emergency that he felt compelled to immediately stop and investigate. Rather he came back after dropping another officer at home. But while he did not believe a burglary was actually in progress, he did not know what the situation was. A burglary might have occurred, someone might have been injured. His purpose was to check for possible injury to persons or property. His search was cursory and limited to achieving this purpose. While the circumstances may not have risen to the level of an emergency, the facts conform to the basic assumption running throughout the case law: the officer was performing his duty as a police officer and his search of the premises was a good faith consequence of that duty. He was not there to find evidence to incriminate the owners but to protect persons and property. Under the reasonableness standard articulated by the magistrate judge, the officer's actions were justified in these circumstances. *Maryland v. Buie,* 494 U.S. 325, 110 S.Ct. 1093, 108 L.Ed.2d 276 (1990), upon which the defendants heavily rely, is distinguishable on both the facts and law applicable to the case at hand.

Accordingly, the court hereby ADOPTS the magistrate judge's report and recommendation as its own opinion. Defendants' motion to suppress is DENIED.

So Ordered.

## REPORT AND RECOMMENDATION

BOYCE, United States Magistrate Judge.

Defendants, Ronald Joseph Bute, Beverly M. Bute, and Steven Barnes, have been indicted by a grand jury and charged in two counts with violations of 21 U.S.C. § 841(a)(1). Count 2 charges possession, on March 21, 1992, of methamphetamine with intent to distribute. Count II charges that on the same date defendants did knowingly and intentionally manufacture a mixture containing methamphetamine (File Entry 1).

The three defendants filed a joint motion to suppress evidence obtained by police claiming it was obtained in violation of the defendants' Fourth Amendment rights (File Entry 65). The joint motion does not particularize the basis for the motion to suppress.[1] A joint memorandum was filed in support of the motion (File Entry 64). An affidavit of investigator Krista L. Pickens was submitted as to the substance of her interview with Salt Lake County Deputy Sheriff Dan McConkey (File Entry 65).[2] The government filed a response to the motion (File Entry 78). Hearing was held before the magistrate judge on the defendants' joint motion to suppress on December 17, 1992. Defendants were granted 14 days from receipt of the transcript to reply to the government's response and the government was given five days thereafter to reply. The transcript was received on December 30, 1992. The defendants' final memorandum was submitted on January 11, 1993, the government replied on January 21, 1993.

The defendants' motion to suppress has been referred to the magistrate judge under 28 U.S.C. § 636(b)(1)(B). This report and recommendation is submitted pursuant to the reference on defendants' motion to suppress.

### Evidence

The hearing on the motion to suppress was held on December 17, 1992 and the transcript received on December 30, 1992. Defendants' memorandum on the motion was received January 11, 1993. The government's reply was late. It was filed January 21, 1993.

At the hearing, it was agreed that with regard to the premises searched in Riverton, Utah, defendants Joseph and Beverly Bute were lessee's of the premises (Tr. p. 5). The government contended defendant Steven Barnes had no interest in the premises. Defendants' counsel indicated that at some previous time, Barnes had used the premises to

---

1. The motion is not in compliance with D.Utah Rules 307(a) and 202.

2. The affidavit gave notice of the facts relied on, but is superceded by the hearing evidence.

paint a car and at an unspecified time for storage with the permission of the Butes. There was no evidence that Barnes had any interest in the premises at the time of the search in question (Tr. p. 6).

Deputy Salt Lake County Sheriff, Daniel McConkey, testified that on March 20, 1992 he was assigned to patrol the Bluffdale, Herriman, Copperton, and Riverton areas of Salt Lake County (Tr. pp. 7–8). He was in a location of 13000 South 2700 West and he knew the area (Tr. p. 9). At about eleven o'clock p.m. (2300 hrs.) he began his shift. The previous patrol deputy would pick him up, he would take that officer home and McConkey would start his shift (Tr. pp. 9–10). McConkey met Deputy Cannon who was going off shift and proceeded to take him home to Sandy, Utah. On the way both officers noticed a garage door open at what was "an old honey manufacture." Both officers made note of the circumstance (Tr. pp. 10–11). McConkey has never seen anyone around the building before. He had not seen the premises open before. McConkey determined to take Deputy Cannon home and return to check it out. The building is cinder block with a small front window with a walk to the door and a garage attached (Tr. p. 11) (see Def's. Exh.I). It was dark at the time. When McConkey drove by, the garage door was completely open. An open field is on the north side and a home to the back on the south (Tr. p. 12). It took about three to five minutes to go from the building to Deputy Cannon's house. McConkey then returned immediately. He radioed in to the dispatcher, said he noticed the door open and was going to check it out (Tr. p. 12). This is a routine procedure. Dispatch is notified of an open door of a building or house (Tr. p. 13). McConkey pulled up and shined a spotlight into the open garage. He observed shelving on the wall, a chair, and "normal garage stuff." There were no vehicles (Id. p. 13). There were no signs of anyone around. McConkey thought possibly someone had burglarized or vandalized the building. He had never seen the door open (Tr. p. 14). After notifying dispatch, the officer approached the building alone. He had a flash-

light and entered the garage on the southside (Tr. p. 14, Def.Exh.I). On entering the building the officer smelled an unusual odor. It was pungent (Tr. p. 15). He got a "slight tingling" on his tongue.

At that point, McConkey decided to search the building to see if anyone was inside. He thought there might have been a burglary (Tr. p. 15). There was a door to the left. He opened it and noticed it was a furnace room. He didn't see anyone (Tr. p. 15). He proceeded to the next door and shined his light in. This room had a couch and looked like a living area. He yelled out if anyone "was there" (Tr. p. 16). He observed a cigarette ash tray, a couch and a television (Id.). The odor McConkey first smelled on entering the building persisted. McConkey had one last door to check. He opened and shined his light inside (Tr. p. 17). He observed glass beakers and bottles. Some had rubber tubing. There was a "TV monitor" on the floor with "snow on the screen." This caused McConkey to believe he "possibly had a lab of some sort" (Id.). He had been given some training in clandestine laboratories (Id.). At that point, McConkey had been in the building for three to four minutes. He was still experiencing the tingling sensation (Id. p. 18). The monitor on the floor had a cable coming from it. He followed it to a camera in the window. McConkey immediately exited the building and asked for backup from a senior officer (Id.).

Sergeant Wood responded in five to ten minutes. McConkey did not reenter the building until the sergeant arrived and then they both went back to the last room and looked. This took 30 to 45 seconds (Tr. p. 19). They both withdrew and attempted to contact "metro-narcotics". Officer Cory Lyman was contacted and "HazMat."[3] Officer Lyman went into the building when he arrived. He was in the building 30 to 45 seconds. The HazMat team arrived and entered the building. The team did not identify any hazardous materials that were an immediate threat (Tr. p. 21). A search warrant was obtained (Def.Exh.2). There is no

---

**3.** Hazardous Materials response unit. This is a unit of the Salt Lake County Fire Department trained for hazardous materials. It is denominated by the acronym HazMat.

evidence that McConkey moved anything or looked in drawers or conducted any search except one of observation.

It was about 12:30 a.m. when Deputy McConkey arrived back at the building after taking Deputy Cannon home (Tr. p. 23). The event was characterized as "an open door" (Tr. p. 24). The officer would have one or two a month (Id.). McConkey did not know what the building was used for, just that Cannon had said it was an old honey manufacturing place (Tr. p. 25). He didn't know if it was an abandoned building or residence (Id.). McConkey did not see obvious signs of a burglary in progress (Tr. p. 27). There were no signs of a forced entry (Id.). When first observed, McConkey and Cannon did not see the need to stop right at that time. When he returned, McConkey radioed in to the dispatcher that he had an open door and was going to check it out (Tr. p. 28). On a burglary in progress, it is generally the sheriff's office policy to wait for a backup. On an open door, it is determined if someone left an open door and the owner may be contacted to lockup. McConkey, however, did think the instance could be a burglary (Id.). He did not believe it was a burglary in progress (Tr. p. 29). He had never seen any vehicles at the premises. There was no evidence offered that anyone used the premises for a residence.

When McConkey smelled the odor and observed the equipment he did not know what kind of lab it was. He didn't know what the smell was (Tr. p. 30). All the entries by McConkey, Sergeant Wood, Agent Lyman and the HazMat people were without a warrant (Tr. p. 31). A search warrant was prepared between 3:30 a.m. and 6:30 a.m. and executed on the premises (Id.).

Officer McConkey had not been to the particular building before (Tr. p. 32). Before entering any of the side doors off from the garage, the officer did not knock before entering (Tr. p. 36). He did not knock because if a burglar was present he did not want to alert the person (Tr. p. 43). There had been no report of a burglary (Tr. p. 38). Deputy McConkey did not make an effort to find the building owner (Tr. pp. 42–43). The officer during the time was concerned about his own

safety (Tr. p. 44). The outside of the building did not appear to be a residence (Tr. p. 45). The officer provided the information for paragraphs 1 through 5 of the search warrant affidavit. The information was true except that McConkey had entered into three rooms before leaving.

The search warrant (Exh.2) was obtained by a Utah Division of Investigation (UDI) officer who was investigating narcotics cases. It recites what McConkey and HazMat Technician Kevin Greer saw when they entered. Greer provided information which was a much more extensive confirmation of various chemicals and equipment on the premises. The affidavit recited the officers detection of an odor of methamphetamine.

Based on the above evidence the following findings are made:

1. On March 20, 1992, deputy Salt Lake County Sheriff Daniel McConkey was making a shift change replacing deputy Sheriff Cannon on the eleven o'clock p.m. shift for south Salt Lake County including the same rural Riverton area. McConkey was taking Deputy Cannon to his home in Sandy, Utah when the officers passed a building at 13180 So. 2700 West in Riverton, Utah known as the "old honey manufacture." Both officers noticed an open garage door. McConkey did not stop and apparently did not believe a burglary was taking place that required an immediate stop. Officer McConkey didn't know if the building was occupied or abandoned. He suspected a possible burglary or vandalism. He determined to check the "open garage door."

2. After dropping off Deputy Cannon, Deputy McConkey returned to the building to check it out. He advised the sheriff's dispatcher that he was going to check out the open door. He did not call for backup. He saw no immediate signs of a burglary in progress. The building was leased by Ronald Joseph Bute and Beverly M. Bute. Defendant Steven Barnes had no connection with the premises at the time, nor any subjective or objective expectation of privacy with regard to the premises.

3. Officer McConkey entered the building and shined his light into the garage and

observed shelving and various materials and objects stored there. He saw no signs of a forced entry or burglary in progress. However, inside the garage portion of the building, McConkey smelled a strong pungent odor that made his tongue tingle. He did not identify any particular chemical.

4. On the side of the garage were three doors. The officer opened the first door to see if anyone was present. He shined his light into the room, could see no one, determined it was a furnace room, and closed the door. The officer opened the second door, flashed his light inside. It appeared to be some kind of quarters. He called out if anyone was present. He noticed a television set, a couch and a table with cigarette butts. Having determined no one was present the officer closed the door. At the third door, the officer opened it and observed beakers, glassware, and rubber tubing. He observed a TV monitor with a cable to a camera. The TV had "snow" on it and was apparently in operation. This caused McConkey to believe he found some sort of lab. He exited immediately partially for his own safety and asked for a backup sergeant. In all, McConkey was in the building for three to four minutes. He was still experiencing the tingling after leaving. McConkey did not seize anything, move items to look in drawers or other secluded orders. There was no evidence of the use of the premises for a residence, the premises were used for clandestine drug activity.

5. Deputy Sheriff Sergeant Wood arrived and McConkey and Wood reentered the building going directly to the lab area. Here an observation was made and the officers exited the building. They were only on the premises 30 to 45 seconds. Nothing observed by Wood or McConkey at that time was used to obtain a search warrant later. A metro narcotics officer and hazardous material (HazMat) personnel were called. Officer Lyman, a narcotics officer, arrived. He entered the building with McConkey and went to the laboratory area and exited the building. Lyman was only on the premises 30 to 45 seconds. Nothing observed by Lyman was used to obtain a later search warrant. The hazardous material personnel arrived and entered. They diagramed the building and HazMat technician Kevin Greer, Salt Lake County Fire Department, made observations of specific chemicals that were added to Deputy McConkey's observations in obtaining a search warrant. All of the entries were made without a warrant.

6. Later, based on the observations of Deputy McConkey and HazMat technician Greer, a UDI officer obtained a search warrant sometime between 3:00 a.m. and 6:00 a.m. The warrant was also based on additional information not the subject of the challenge to the search of the building in question.

7. Deputy McConkey had not previously seen any activity either persons or vehicles at the premises searched. He did not know what the building was used for before the incident. He was not looking for criminal activity on the premises by the building users when he entered.

8. A search of the premises involved showed a laboratory for the manufacture of methamphetamine.

### Discussion

The defendants' initial motion to suppress (File Entry 63) asserts the basis of their motion as being that presented in their memorandum.[4] The defendants' joint memorandum (File Entry 64) complains that the original entry of Deputy Sheriff McConkey was illegal and in violation of defendants' privacy interests in the absence of exigent circumstances. (Id.). The government's initial response (File Entry 78) challenged the defendants' standing to contest the search and contended the laboratory equipment was seized in plain view following a lawful "investigatory sweep." (Id. p. 3). The post hearing memorandum of the defendants again asserts that Deputy McConkey's entry was illegal, defendants had standing and that the resulting discovery of the laboratory was the

---

4. This does not comply with D.Utah Rules 307(b) and 202. The motion should state with particularity the basis of the motion to suppress.

product of the illegal entry which warrants suppression. Defendants contend there "was no exigent" circumstance to justify entry. In its post hearing reply (File Entry 1/21/93) the government again asserts McConkey's warrantless entry onto the premises, was justified and the discovery of the laboratory justified. Therefore, the primary, exclusive issue the court must determine, as raised by defendants, is whether the entry of Deputy McConkey was constitutionally permissible.

*Standing*

■ The government contests the standing of defendants to complain of Deputy McConkey's entry into the premises. Under *United States v. Dewitt,* 946 F.2d 1497 (10th Cir.1991), since the government has challenged defendants' standing, the burden of showing the requisite expectation of privacy is on the defendants. See *Rakas v. Illinois,* 439 U.S. 128, 99 S.Ct. 421, 58 L.Ed.2d 387 (1978); *United States v. Arango,* 912 F.2d 441 (10th Cir.1990); *United States v. Skowronski,* 827 F.2d 1414 (10th Cir.1987); *United States v. Hansen,* 652 F.2d 1374 (10th Cir.1981); *United States v. Rios,* 611 F.2d 1335 (10th Cir.1979). See also *United States v. Martinez,* 983 F.2d 968 (10th Cir.1992).

■ In this case, defendants Ronald Joseph Bute and Beverly M. Bute were the lessors of the premises. The government concedes this fact. As such they had sufficient expectation of privacy in the premises to give them standing to challenge the search. See *Stoner v. California,* 376 U.S. 483, 84 S.Ct. 889, 11 L.Ed.2d 856 (1964); *United States v. Jeffers,* 342 U.S. 48, 72 S.Ct. 93, 96 L.Ed. 59 (1951); *United States v. Mayer,* 620 F.Supp. 249 (D.Utah 1985) reversed other grounds 818 F.2d 725 (10th Cir.1987). See also *United States v. Eyster,* 948 F.2d 1196 (11th Cir.1991).

■ However, defendant Steven Barnes has not shown a sufficient expectation of privacy to confer standing on him to contest the search in this case. At the time of the search Barnes had no legal property interest in the premises, was not on the premises, and did not reside there or otherwise have connection with the premises. The only connection of Barnes to the building was that at one time he used the premises to paint a car and stored it on the premises. That was at a different time. There is no evidence that at the time of the search Barnes had any interest in the premises whatsoever. Barnes may not assert a vicarious interest in the premises. *Wong Sun v. United States,* 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963); *Brown v. United States,* 411 U.S. 223, 93 S.Ct. 1565, 36 L.Ed.2d 208 (1973); *United States v. Payner,* 447 U.S. 727, 100 S.Ct. 2439, 65 L.Ed.2d 468 (1980). Barnes may only complain as to a search effecting his own privacy interests. *United States v. Rubio–Rivera,* 917 F.2d 1271 (10th Cir.1990); *United States v. Goff,* 736 F.Supp. 1087 (D.Utah 1990). Barnes has not shown an interest in the premises and cannot complain of the entry or search. See *United States v. Hansen,* supra (no interest in hotel room of another); *United States v. Carr,* 939 F.2d 1442 (10th Cir.1991); *United States v. Nabors,* 761 F.2d 465 (8th Cir.1985); *United States v. Akin,* 562 F.2d 459 (7th Cir.1977); *United States v. Bright,* 630 F.2d 804 (5th Cir.1980); *United States v. Aguirre,* 839 F.2d 854 (1st Cir.1988).

Therefore, Barnes has no standing as to this motion and his request for suppression should be denied.

*Entry and Search*

■ The defendants correctly note that normally police entry into a premises in which a person has an expectation of privacy must be pursuant to a warrant. *Katz v. United States,* 389 U.S. 347, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967). The predications of a warrant apply to premises other than a home such as commercial premises *O'Connor v. Ortega,* 480 U.S. 709, 107 S.Ct. 1492, 94 L.Ed.2d 714 (1987); *Marshall v. Barlow's, Inc.,* 436 U.S. 307, 98 S.Ct. 1816, 56 L.Ed.2d 305 (1978); *G.M. Leasing Corp. v. United States,* 429 U.S. 338, 97 S.Ct. 619, 50 L.Ed.2d 530 (1977); *Silverthorne Lumber v. United States,* 251 U.S. 385, 40 S.Ct. 182, 64 L.Ed. 319 (1920); *Blackie's House of Beef, Inc. v. Castillo,* 659 F.2d 1211 (D.C.Cir.1981). There was no warrant obtained in this case by McConkey before his entry and therefore the entry and search to be lawful must be

premised on some exception to the warrant requirement. Both parties have focused on the "exigent circumstances" exception and the government has advanced a form of protective sweep argument. Courts have often found labels and phrases as convenient expressions for exceptions to the warrant requirement. However, the "exigent circumstances" exception for entry into an area where there is an expectation of privacy usually entails the need to apprehend a fleeing suspect, detain a fleeing vehicle, or prevent contraband from being destroyed before a warrant could be obtained. *Johnson v. United States*, 333 U.S. 10, 68 S.Ct. 367, 92 L.Ed. 436 (1948); *Vale v. Louisiana*, 399 U.S. 30, 90 S.Ct. 1969, 26 L.Ed.2d 409 (1970); *California v. Carney*, 471 U.S. 386, 105 S.Ct. 2066, 85 L.Ed.2d 406 (1985); *Ker v. California*, 374 U.S. 23, 41–42, 83 S.Ct. 1623, 1634–1635, 10 L.Ed.2d 726 (1963); *United States v. Aquino*, 836 F.2d 1268, 1273 (10th Cir.1988); *United States v. Chavez*, 812 F.2d 1295, 1299–1300 (10th Cir.1987).

■ The limited protective sweep concept recognized in *Maryland v. Buie*, 494 U.S. 325, 110 S.Ct. 1093, 108 L.Ed.2d 276 (1990), involves a doctrine which follows from a lawful entry onto premises where there is a "reasonable belief based on specific and articulable facts that the area to be swept harbors an individual posing as a danger to those on the arrest scene." Id. at 337, 110 S.Ct. at 1100. See also *United States v. Tisdale*, 921 F.2d 1095, 1097 (10th Cir.1990).

■ In this case, Deputy McConkey first became aware of the open door at the "honey manufacture" premises while taking Deputy Cannon home. The matter was not of sufficient emergency that McConkey or Cannon felt the need to alter the shift change procedure.[5] McConkey testified only that he thought there was a possibility the premises were the subject of burglary or vandalism.[6] During the entry he did not really believe there was a burglary in progress. He really wasn't sure just what the circumstances

were, he knew only that there was an open garage door, late at night, at premises which were known as abandoned or commercial premises where the officer had never seen any person or seen the premises open. The officer's actions were protective of the premises. He did not intend to investigate any crime committed by or which may have involved anyone who had any legitimate expectation of privacy in the premises. McConkey was looking in the building to see if there was some injury to or disturbance on unoccupied commercial premises. Thus the traditional concepts of exigent circumstances and protective sweep are not applicable as exceptions to the warrant requirement under the circumstances of this case.

However, the warrant requirement is a preference and mandated unless there is an exception *Katz*, supra 389 U.S. at 357, 88 S.Ct. at 514. However, the Fourth Amendment by its literal terms prohibits only "unreasonable searches and seizures...." If the conduct in making a warrantless search or seizure is not unreasonable under the circumstances, the search does not violate the Fourth Amendment. In some instances, the use of a warrant is the only situation where a search or seizure is reasonable. In other contexts the warrant is not as critical and the conduct of police may be judged by the reasonableness standard. The importance of the reasonableness language of the Fourth Amendment was recently underscored by the Supreme Court in *Skinner v. Railway Labor Executives' Ass'n.*, 489 U.S. 602, 618, 109 S.Ct. 1402, 1414, 103 L.Ed.2d 639 (1989):

"[T]he Fourth Amendment does not prescribe all searches and seizures, but only those that are unreasonably" ... what is reasonable, of course, "depends on the circumstances surrounding the search or seizure itself." ... Thus, the permissibility of a particular practice "is judged by balancing its intrusion on the individual's Fourth Amendment interests against its

---

5. A good measure of exigency is whether the circumstance is of sufficient importance to delay the very compelling need of an officer to go off duty at the end of a shift.

6. The magistrate judge takes judicial notice that the Riverton area of Salt Lake County is rural/suburban area. The area is in transition from a farming area to a suburban bedroom area for Salt Lake City. F.R.E., 201.

promotion of legitimate governmental interests."

It has been said the "fundamental inquiry in considering Fourth Amendment issues is whether or not a search or seizure is reasonable under all the circumstances." *United States v. Chadwick*, 433 U.S. 1, 97 S.Ct. 2476, 53 L.Ed.2d 538 (1977); See also *Dunaway v. New York*, 442 U.S. 200, 219, 99 S.Ct. 2248, 2260, 60 L.Ed.2d 824 (1979) (White, J. concurring); *Michigan Dept. of State Police v. Sitz*, 496 U.S. 444, 110 S.Ct. 2481, 110 L.Ed.2d 412 (1990); *Illinois v. Rodriguez*, 497 U.S. 177, 110 S.Ct. 2793, 111 L.Ed.2d 148 (1990). See also *United States v. Bloom*, 975 F.2d 1447, 1455 (10th Cir.1992); *United States v. Salinas–Cano*, 959 F.2d 861, 865 (10th Cir.1992); *United States v. Carr*, 939 F.2d 1442, 1448 (10th Cir.1991) (" 'Reasonableness' is the overriding test of compliance with the Fourth Amendment"); *United States v. Mesa–Rincon*, 911 F.2d 1433, 1442 (10th Cir.1990).

It is under a reasonableness analysis that the constitutionality search [7] in this case must be determined. Few federal cases appear to have considered a reasonableness exception to the warrant requirement where an officer finds open commercial premises in the night time. No evidence shows anyone actually lived on the premises. Of course, federal cases have recognized the need to act without a warrant to suppress a fire or to protect private premises from additional damage or determine the source of a fire or explosion. *Michigan v. Tyler*, 436 U.S. 499, 98 S.Ct. 1942, 56 L.Ed.2d 486 (1978); *Michigan v. Clifford*, 464 U.S. 287, 104 S.Ct. 641, 78 L.Ed.2d 477 (1984). Although, not specifically related to the circumstances of this case, the *Tyler* and *Clifford* cases recognize a legitimate interest of the public in protecting private property interests. These kind of entries might be labeled "special needs" entries. See *Twenty–First Annual Review of Criminal Procedure: United States Supreme Court and Court of Appeals, 1990–1991*, 80 Georgetown L.Jnl. 4 (1992) p. 1031. However again, the danger is in attaching too

much significance to "labels" or stylish "terminology" rather than careful constitutional analysis.

In *United States v. Estese*, 479 F.2d 1273 (6th Cir.1973) police responded to a call of a breaking and entering into an apartment. They found the apartment door open and they entered. There was evidence of a breaking or indication the door had been pried open. The officers found a bowl full of marijuana in plain view and a sawed off shotgun under a waterbed where a burglar could be hiding. The court upheld the entry and seizure. Although the facts of this case are stronger in their context in the suggestion of a burglary,[8] the case recognized the reasonableness of a warrantless entry to determine if premises had been the object of criminal conduct. There was no indication who reported the breaking or what corroboration the officers had as to who had reported it. The court noted:

> On their arrival the officers had no way of knowing this, but there was probable cause for the officers on the scene to believe that a burglary had been or was being committed and to search the apartment for the burglar.

479 F.2d at 1274.

In this case, although McConkey did not believe a burglary was then in progress, he did not actually know and thought the premises may have been vandalized or burglarized.

In *United States v. Moskow*, 588 F.2d 882 (3rd Cir.1978) the defendant contended a warrantless entry onto commercial premises by police violated the Fourth Amendment and evidence observed in plain view could not be used to arrest defendant. The police had specific information of an entry into a building and an odor of gasoline coming from it at a late hour. The court rejected defendants' Fourth Amendment argument:

> We agree with the government that to allow this situation to go uninvestigated for the several hours it would have taken to

---

7. There was no seizure conducted by deputy McConkey. The only seizure was pursuant to warrant. McConkey only made observations and smelled the chemicals on the premises.

8. In fact a burglary had occurred in *Estese*.

obtain a warrant would have allowed a grave public danger to go uncorrected, and reject Moskow's suggestion that the danger had passed when the police arrived and that they had a present ability to "freeze" the situation by securing the premises from the outside. Indeed, it can be said that it was the duty both of the police and the fire marshal to act promptly to investigate and eliminate the public hazard.

The court relied on *Michigan v. Tyler*, supra, by analogy. *Id.* In this case, the officer saw an open garage at night and immediately on entry was confronted with a pungent smell that made his tongue tingle. Although, the officer did not know what the odor or chemical smell was, his concern about the situation was heightened and that concern was objectively reasonable.

In *United States v. Barone*, 330 F.2d 543, 545 (2nd Cir.1964) the court noted the general desirability of police making entries that are not to arrest or pursue criminal charges against persons legitimately on the premises. The court said:

> The right of police to enter and investigate in an emergency without the accompanying intent to either search or arrest is inherent in the very nature of their duties as police officer, and *derives from the common law.* (Emphasis added).

See also Judge (later Chief Justice) Berger's observations in *Wayne v. United States*, 318 F.2d 205 (D.C.Cir.1963).

Many cases recognize an emergency doctrine for entry onto premises. The emergencies are varied. Some are more immediate than others. See *United States v. Echegoyen*, 799 F.2d 1271 (9th Cir.1986); *United States v. Moskow*, supra; *Michigan v. Tyler*, supra; *Michigan v. Clifford*, supra. Mascolo, *The Emergency Doctrine Exception to the Warrant Requirement Under the Fourth Amendment*, 22 Buffalo L.Rev. 419, 426–427

(1973); LaFave, *Search and Seizure*, 2d Ed. § 6.5 Id.). The emergency doctrine is not quite the same as the protection of the community or private property interests involved in this case.[9]

Professor LaFave has recognized the reasonableness of a warrantless search under the precise circumstances of this case. He has also categorized the justification as different from the exigent circumstances to avoid loss of evidence, a fire, or an emergency to save life. In LaFave, *supra* § 6.6(b) it is acknowledged the courts have recognized the right to enter property for its protection:[10]

> Police may also enter private property for the purpose of protecting the property of the owner or occupant or some other person. One possibility is where the police reasonably believe that the premises have recently been or are being burglarized. Thus, police entry is justified on the basis of a breaking and entering call to police plus the discovery of an open door which bore evidence of being pried open, of activation of a burglar alarm at those premises, of the observation of lights on within and strange cars parked about a house whose occupants a neighbor says are on vacation, and of a neighbor's report that strangers were seen coming from a cabin in an area where many cabins had recently been broken into. By the same reasoning, it would seem that police entry is justified where persons possibly intent upon vandalism are reported by a neighbor to have entered a vacant house. *Indeed, entry would be permissible when commercial premises are found to be unlocked and unattended in the evening hours.* (Emphasis added).

See *Mann v. Cannon*, 731 F.2d 54 (1st Cir. 1984) (entry into vandalized premises).

In at least three state cases the courts have determined entry into commercial premises to determine the security of prem-

---

**9.** See *United States v. Bonitz*, 826 F.2d 954 (10th Cir.1987). The majority recognized an emergency exception doctrine to the Fourth Amendment but found it inapplicable under facts not relevant to this case.

**10.** Of course merely because officers are not performing a law enforcement function does not mean the Fourth Amendment is inapplicable. See *Soldal v. Cook County*, —— U.S. ——, 113 S.Ct. 538, 121 L.Ed.2d 450 (1992); *Specht v. Jensen*, 832 F.2d 1516 (10th Cir.1987). The standard is one of reasonableness.

ises which are found open or unlocked is reasonable. State courts are probably more likely to encounter open door business cases than are federal courts. This kind of function is a local police function.

In *People v. Parra*, 30 Cal.App.3d 729, 106 Cal.Rptr. 531 (1973) the police responded to a call that the door of a florist shop was open.[11] An officer arriving noted the door was open, he could not determine the proprietor and stepped inside with a flashlight. In attempting to discover the owner, heroin was found in a drawer. The court upheld the use of the evidence. The court noted the officer entered based on his observations and not to track down a criminal but to protect the premises (106 Cal.Rptr. 531, 535). The court said:

> There is nothing in the record to suggest that the officers entered the retail business establishment for any purpose other than to provide for its security. To paraphrase § 197 of the Restatement of Torts (2d ed), one is privileged to enter and remain on land in the possession of another if it reasonably appears to be necessary to prevent serious harm to the land or chattels of the other party, unless the actor has reason to know that the one for whose benefit he enters is unwilling that he should take such action. * * * According to the uncontradicted and credible evidence before the trial court, the officers entered the Alpar Florist Shop to protect the shop and its contents. Their presence in the shop was privileged.

The court recognized the common law assessment of the reasonableness of such an entry. The entry was obviously reasonable and circumstances paralleled those in this case. Here Deputy McConkey did not look in drawers or move objects.[12] McConkey was not on notice at the time of the entry that the premises occupants would object. He did not know who such persons were.

In this case, Deputy McConkey entered the garage of a commercial establishment because it was open. The relevant rooms were checked to determine if a burglary or injury to the property had occurred. These were immediately adjacent to the garage and it would have been unreasonable not to have checked the rooms for persons or disturbances. The fact the inside doors were not open (not locked) is not of constitutional significance under the facts of this case.[13]

In *People v. Gardner*, 121 Ill.App.3d 464, 76 Ill.Dec. 761, 459 N.E.2d 676 (1984) an officer made an entry into commercial premises. The officer found a rear door unlocked, entered the premises to ascertain the owner, and determine the status of the premises. There he observed stolen property.[14] The court considered the Fourth Amendment issues and surveyed the cases on the particular kind of entry involved. The court cited and accepted the LaFave treatise as authoritative. The court said:

> A distillation of the above cases reflects that in certain limited circumstances law enforcement officials may enter an unsecured or unlocked commercial establishment during a nighttime security check to secure the premises and may take necessary measures to ascertain the identity of the proprietor. However, the courts will be vigilant to ensure that the rationale of protecting private property is not employed as a · subterfuge to seek out evidence of criminal conduct. See 2 W. La-

---

11. It is not factually or constitutionally significant that police were alerted to an open door from a citizen's complaint or from the officer's own observations.

12. The officer is between an argumentative rock and a hard place. If the officer moves objects the conduct is unreasonable (*Arizona v. Hicks*, 480 U.S. 321, 107 S.Ct. 1149, 94 L.Ed.2d 347 (1987) will be cited). If the officer merely looks, it may be argued he should do more to find the owner. Often arguments in the name of Fourth

Amendment protection are themselves "unreasonable." The Constitution was intended to apply to reasonable common human beings not medieval scholars.

13. For these reasons and others *United States v. Selberg*, 630 F.2d 1292 (8th Cir.1980) is inapropos and not persuasive under the circumstances.

14. The property was later determined to be stolen when the officer made a subsequent check.

Fave, Search & Seizure § 6.6(b), at 474–75 (1978).

The Court went on to say:

.... we conclude that the warrantless entry of the police officer in this case did not run afoul of the fourth amendment. Given the very limited nature of the warrantless intrusion in the present case, the officer's actions were reasonable under the fourth amendment. Further we conclude that since the officer was properly on the premises, Behner's observation of the blue AMC jeep, which was in plain view, was also proper. (See *Coolidge v. New Hampshire* (1971), 403 U.S. 443, 91 S.Ct. 2022, 29 L.Ed.2d 564.) In addition, as the trial court recognized at the conclusion of the suppression hearing, if the initial entry was proper, then probable cause existed for the issuance of the search warrants once Officer Behner learned from the Addison police department that the blue jeep was a stolen vehicle.

The situation in *Gardner* is particularly parallel to the situation in this case.

In *State v. Myers*, 601 P.2d 239 (Alaska 1979), a lead case on the issue, an officer entered unlocked commercial premises in Juneau, Alaska at 2:30 a.m. as a part of a routine check of establishments.[15] The check was for intruders and to secure the premises. Cocaine was observed as well as drug paraphernalia. The Alaska court upheld the use of the evidence. The court considered the search under the Fourth Amendment and the Alaska Constitution. The court surveyed the relevant Supreme Court precedents, noted and discussed herein, and concluded:

However, the traditional means supplied by the Constitution to ensure that protected rights are not infringed by otherwise reasonable intrusions, namely, the requirement that a search warrant first be obtained, is unavailing in the present case. The Constitution provides that "[n]o warrants shall issue, but upon probable cause," and it is conceded that security checks, including the one conducted here, are procedures to which the traditional concept of

probable cause is inapposite, thus precluding the issuance of a constitutional warrant. Though a warrant procedure based on less than probable cause has been approved for certain kinds of administrative searches, the justifications for doing so in those cases are not present here. Whereas administrative searches are premeditated government actions involving ample time to procure a warrant, and often take place in foreseeable adversary circumstances in which a warrant is seen as a buffer of rationality, security checks are undertaken on behalf of property owners, are responsive to immediate needs, and are required so often as to render the warrant procedure impractical.

To impose a warrant requirement on such searches, therefore, would be to forsake the substantial expectations of protection against burglary held by a large segment of the community. Such a result is unnecessary to protect the privacy rights potentially jeopardized by a rule legitimizing security checks. As the Supreme Court has declared with respect to the deleterious effect a warrant procedure might have on the statutory goals of certain administrative searches, "[t]he reasonableness of a warrantless search ... will depend upon the specific enforcement needs and privacy guarantees of each statute." *Marshall v. Barlow's, Inc.*, 436 U.S. 307, 321, 98 S.Ct. 1816, 1825, 56 L.Ed.2d 305, 317 (1978). Correspondingly, we believe that a narrowly drawn exception to the warrant requirement can effectively legitimize and protect, respectively, the countervailing interests drawn in question by security checks of business premises.

Accordingly, we hold that law enforcement personnel may enter commercial premises without a warrant only when, pursuant to a routine after-hours security check undertaken to protect the interests of the property owner, it is discovered that the security of the premises is in jeopardy,

---

**15.** Deputy McConkey testified that "open door" premises checks were routine, encountering at about one or two a month.

and only when there is no reason to believe that the owner would not consent to such an entry. In the context with which we are immediately concerned, locked premises must be taken as indicating that no warrantless entry is authorized. Any search conducted incident to a legitimate entry must be brief and must be limited and necessary to the purpose of ensuring that no intruders are present on the premises. In addition, someone responsible for the premises must be informed, as soon as is practicable, of the protective measures taken.

The decision of the Alaska Supreme Court is particularly persuasive. It avoids labels and makes a sound constitutional analysis balancing the various interests involved. The reasoning does not damage constitutional privacy interests and is no broader than the justifying circumstances dictate. The concurring opinion of Justice Rabinowitz is also instructive as he argues for a broader constitutional theory under the emergency exception to the warrant requirement. *Id.* p. 245. What is also significant in the state and lower federal cases is their recognition of the common law tolerance for such entries, the fact that police and public officers perform many function that are not directed at prosecution, *G.M. Leasing,* supra, and that the public expects and respects such a function. 601 P.2d at 244. If anything would "shock the conscience" it would be to tell the citizenry of Riverton, Utah or other similarly situated communities that their police may not be good community officials and protect their property interests and "domestic tranquility"[16] by checking unsecured premises, even when common sense would affirm the conduct as being reasonable under the circumstances.

Officer McConkey did not seize items. He did not open drawers. He knew the area where the building was and had never seen it used or disturbed. He entered and looked in the premises and its rooms to determine the status of the premises and for the security of the property. He was in the premises only for a few minutes and left immediately on detecting the chemicals in the last room. His actions were also based on concern for his own safety. His conduct was reasonable. There is no issue of pretense or of Deputy McConkey's credibility. His observations, later used to obtain a warrant, were made about things in "plain view" while he was lawfully on the premises. Such evidence was lawfully obtained. *Horton v. California,* 496 U.S. 128, 110 S.Ct. 2301, 110 L.Ed.2d 112 (1990); *Illinois v. Andreas,* 463 U.S. 765, 103 S.Ct. 3319, 77 L.Ed.2d 1003 (1983); *Texas v. Brown,* 460 U.S. 730, 103 S.Ct. 1535, 75 L.Ed.2d 502 (1983); *Washington v. Chrisman,* 455 U.S. 1, 102 S.Ct. 812, 70 L.Ed.2d 778 (1982); *United States v. Silkwood,* 893 F.2d 245 (10th Cir.1989); *United States v. Falcon,* 766 F.2d 1469 (10th Cir.1985); *United States v. Gabriel,* 715 F.2d 1447 (10th Cir.1983).

### *Conclusion*

When analyzed under the concept of reasonableness, the search and discovery of evidence uncovered by Deputy McConkey was constitutionally obtained and defendants' motion to suppress should be denied.

Copies of the foregoing report and recommendation are being mailed to the parties. They are hereby notified of their right to file objections hereto within 10 days from the receipt hereof.

DATED this 27th day of January, 1993.

**16.** Preamble to the Constitution of the United States.